COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Malveaux, Raphael and Senior Judge Petty
Argued at Richmond, Virginia


DANNY LEE HUFFMAN

v.      Record No. 0765-22-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE WILLIAM G. PETTY
MARCH 12, 2024


FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY
Ricardo Rigual, Judge

Scott Seguin (Laura Razzuri; Calderon Seguin, on brief), for
appellant.

Elizabeth Kiernan Fitzgerald, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


A jury convicted Danny Lee Huffman of two counts of first-degree murder and two counts

of using a firearm in the commission of a felony. The trial court sentenced Huffman to a total of

206 years' incarceration with all but 48 years suspended. On appeal, Huffman argues that the trial

court erred in excluding evidence of the victims' criminal history, admitting certain expert

testimony, and refusing to instruct the jury on imperfect self-defense. For the following reasons, we

affirm the trial court's judgment.

BACKGROUND[1]

On the evening of July 4, 2020, Danny Huffman and his son Austin were returning from the

home of Huffman's girlfriend, Karen Moncayo. Huffman, a heavy drinker who regularly drank 40

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] "In accordance with familiar principles of appellate review, the facts will be stated in
the light most favorable to the Commonwealth, the prevailing party at trial." *Carter v.
Commonwealth*, 300 Va. 371, 374 (2021).

beers daily, had been drinking since the early morning hours while he worked on a construction project. He consumed 6 beers on the site between approximately 6:00 a.m. and noon, and purchased a 24-pack of beer on his way to Moncayo's home. While he was at Moncayo's, the pair got into a heated argument. Huffman had tried to use a knife to remove a tattoo of her name, causing an injury that continued to bleed as he drove back to his house.

As Huffman and Austin approached home, they encountered a black Camaro occupied by Joe and Fred Swick. The Camaro was driving aggressively, "cutting them off in the middle of the road, [and] brake checking them." When Huffman attempted to pass the Camaro, it blocked the other lane to stop him, prompting an enraged Huffman to trade profanities with the Swick brothers. Later, the Camaro stopped in the middle of the roadway, forcing Huffman to stop behind it. He exited his vehicle and approached the Camaro, drew his firearm, and fired a warning shot into the woods. Huffman then returned to his vehicle, drove home, and stopped at his mailbox.

The Camaro followed Huffman as he drove, and parked near his stopped car. Huffman approached and, following an exchange of words, again drew his Smith & Wesson firearm. He fired 12 rounds into the Camaro, killing the unarmed Swick brothers.

Afterward, Huffman returned to his vehicle, secured his weapon, and finished his drive home. He instructed his son to call an attorney while he tossed the Smith & Wesson into a pond on his property. Huffman then called 911, dropped his knife in a bathroom floor vent, and waited for officers to arrive.

Detective Perkins with the Spotsylvania County Sheriff's Office processed the crime scene and recovered 12 cartridge casings "directly beside the passenger window" of the Camaro. He also photographed the victims as they were found; Fred Swick in the passenger's seat, and Joe in the driver's seat. The Camaro's rear seat was full of various items, including a cooler of beer. Notably, no weapons were found in the vehicle.

Detective Perkins executed a search warrant on Huffman's property, where he recovered ammunition, knives, a bloody towel, and a Derringer pistol. Detective Jacques found a box of cartridges in Huffman's home consistent with those found by the Camaro, and located "some loose cartridges and some boxes of ammunition," in Huffman's vehicle. Detective Handy recovered a pocketknife with a "reddish brown substance on the end . . . consistent with dry blood." He took pictures of a wound on Huffman's tattooed arm, which was "more consistent with a slicing" than a stabbing. At the officers' request, Huffman led them to the pond to recover his Smith & Wesson.

Dr. Jennifer Bowers performed the autopsies, and found that Fred and Joe received a combined total of 19 gunshot wounds. Fred suffered nine wounds: one to his face, six to his torso, and two to his extremities. Joe sustained ten wounds: one to the chest, four to the abdomen, one to the lower-left abdominal quadrant, and four to his extremities. Most of the gunshot wounds came from a downward trajectory.

Two separate Spotsylvania County grand juries indicted Huffman for the two murder charges and for the two charges for use of a firearm in the commission of a felony. In a pre-trial motion, the Commonwealth moved the trial court to exclude evidence of the Swick brothers' criminal convictions. These convictions included Joe's 22-year-old conviction for forcible sodomy and Fred's post-2000 convictions of assault, theft, fraud, failure to appear, various drug-related charges, and traffic matters—including hit and run and eluding the police. With the exception of Fred's hit and run, the trial court excluded all of the Swick brothers' convictions, finding they were not "relevant in any way" to Huffman's case. In doing so, the trial court determined that Huffman had not shown that Joe's decades-old conviction could "characterize" his conduct toward Huffman on the evening of the killing. Applying the same logic to Fred, the trial court determined that it had "heard nothing" to believe that most of Fred's prior convictions were relevant to his conduct

towards Huffman just before his death. The trial court withheld a determination with respect to Fred's hit and run conviction, pending additional evidence of its "violent" circumstances.[2]

At trial, Huffman claimed that he initially pulled over to offer assistance to the driver of the Camaro. In response, Joe got out of the Camaro and approached Huffman, gesticulating and yelling. This behavior prompted Huffman to exit his car and fire a warning shot into the ditch to "let him know I wasn't joking." Huffman claimed that he could see "three more hands" in the vehicle and believed there was a third occupant. He returned to his car and drove home, stopping at his mailbox, where the Camaro pulled up beside him and blinded him with its high beams. Huffman stated he heard someone say, "I've got fireworks for you and your son," which "scared the shit out of" him. He also felt his arm burning and claimed that he had been stabbed. He said that he pulled his firearm and fired straight down. He testified that he saw a revolver in the passenger's hand and "would not have shot" but for the presence of the gun.

After the shooting, Huffman and Austin returned home. Huffman testified that he gave his wallet to Austin and directed him to call an attorney service. He handed his knife and Derringer to Austin to put on the coffee table in the living room, because the attorney told Huffman to "get all weapons off" of him. He drank another beer to calm his nerves and went to a pond on his property. Claiming that he felt "disgusted" by the presence of the Smith & Wesson, Huffman dropped it into the water.

Before submitting the evidence to the jury, Huffman sought a jury instruction on "imperfect self-defense." The text of the proposed instruction read:

> If fear was adequately and in fact provoked, but is insufficient for self defense, the resultant killing is voluntary manslaughter. Thus, the fearful killer is a manslaughterer when his fear is produced by

---

[2] Though the trial court did not mention every one of Fred's prior convictions, its written order excluded "all" prior convictions "addressed at the hearing."

> facts insufficient to make him a self-defender, e.g., the deadly response was unnecessary or the fear was unreasonable.

The trial court rejected this instruction, ruling that the issue was adequately addressed by other instructions and that it would serve only to confuse the jury.[3]  During deliberations, the jury asked "what if we believe there was heat of passion that was provoked by words, can it still be malicious?"  The trial court instructed the jury on the distinction between murder and manslaughter, the definitions of malice and heat of passion, and that words alone cannot serve as justification for a heat of passion.

The jury returned guilty verdicts on all four charges.  During sentencing, Huffman again attempted to introduce evidence of Joe's prior bad acts.[4]  The court excluded the evidence, holding that it "in no way mitigates any culpability on behalf of the defendant" and that there was "no evidence" "that [Huffman] knew anything about anyone, any one of these people on the night that it happened."  One of the Commonwealth's sentencing witnesses, Sandra Kreger, testified that "Joe respected everybody else," would "give you his last dime," "always contributed," and "never" had to be asked "to do the right thing."  In response to her testimony and that of Peggy Yonce, Huffman attempted once more to introduce the prior bad acts evidence to rebut what he contended was evidence of Joe's character.  The unpersuaded trial court excluded the evidence.  The trial court sentenced Huffman to 206 years' incarceration with all but 48 years suspended.  Huffman appeals.

---

[3] The jury was instructed on first-degree murder, second-degree murder, voluntary manslaughter, malice, heat of passion, voluntary intoxication, self-defense, and the law of necessity, as well as the right to arm oneself.

[4] Huffman did not exercise his right to sentencing by a jury.  *See* Code § 19.2-295.

ANALYSIS

I. Admissibility of Character Evidence

"It is well-settled that '[d]ecisions regarding the admissibility of evidence "lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion."'" *Nottingham v. Commonwealth*, 73 Va. App. 221, 231 (2021) (quoting *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019)). "In evaluating whether a trial court abused its discretion, . . . we do not substitute our judgment for that of the trial court. Rather, we consider only whether the record fairly supports the trial court's action." *Kenner v. Commonwealth*, 299 Va. 414, 423 (2021) (quoting *Carter v. Commonwealth*, 293 Va. 537, 543 (2017)).

Generally, "[e]vidence of a person's character or character trait is not admissible for the purposes of proving action in conformity therewith on a particular occasion." Va. R. Evid. 2:404(a). But "where an accused adduces evidence that he acted in self-defense, evidence of specific acts is admissible to show the character of the decedent for turbulence and violence, even if the accused is unaware of such character."[5] *Carter*, 293 Va. at 546 (quoting *Barnes v. Commonwealth*, 214 Va. 24, 25 (1973)). "[T]he ultimate issue becomes whether such evidence of prior conduct was sufficiently connected in time and circumstances . . . as to be likely to characterize the victim's conduct toward the defendant." *Id.* (alterations in original) (quoting *Barnes*, 214 Va. at 25). Stated differently, the test is whether the evidence of prior character is "so distant in time as to be void of real probative value in showing present character." *Id.* (quoting *Barnes*, 214 Va. at 25).

---

[5] In excluding evidence of Joe's conviction, the trial court commented on the fact that Huffman was unaware of Joe's conviction at the time of the offense. *See Carter*, 293 Va. at 546 (quoting *Barnes v. Commonwealth*, 214 Va. 24, 25 (1973)).

A.  At Trial

Although Huffman proffered the nature and circumstances of Joe's sodomy conviction, the trial court was unconvinced that this 22-year-old sex offense "likely characterized" Joe's conduct toward Huffman.[6]  The trial court found that its relevance for either "time" or "circumstances" was "nonexistent," and ruled that the conduct from "such a long time ago, under those circumstances" was irrelevant.  *See Carter*, 293 Va. at 547 (holding that the trial court properly excluded acts of violence that occurred between three and ten years before the incident, under substantially different circumstances).  Seeing nothing in the record creating a nexus between this decades-old conviction and Joe's conduct towards Huffman on the night of the killing, we cannot say that the record lacks support for this ruling.

Turning to the trial court's ruling regarding Fred's convictions, we likewise find that the record supports the court's relevance ruling.  Although not as old as Joe's prior conviction, Fred's were not accompanied with an evidentiary proffer or any other "independent evidence."  Consequently, the trial court determined that it had "heard nothing" that would lead it to believe that Fred's convictions were relevant to the "time" or "circumstances surrounding" the brothers' deaths, and excluded them.  The sole exception was his hit and run conviction, which the trial court took under advisement "if it becomes relevant."  Considering the lack of evidence or proffer with respect to Fred's other offenses, we cannot say the court was plainly wrong in excluding them.

B.  At Sentencing

Code § 19.2-295.1 provides that at sentencing, "the defendant may introduce relevant, admissible evidence related to punishment."  A defendant may present mitigating evidence, which tends to explain, but not excuse, the crime.  *Kearney v. Commonwealth*, 36 Va. App. 106, 108

---

[6] According to Huffman's proffer, Joe—at the time a juvenile—abducted his victim off the street before beating and sexually assaulting him.  Joe was tried as an adult and served a 15-year sentence.

(2001). "[D]iscretion is vested in the trial court to determine, subject to the rules of evidence governing admissibility, the evidence which may be adduced in mitigation of the offense." *Coppola v. Commonwealth*, 220 Va. 243, 253 (1979).[7] But he may not argue or present evidence of "residual doubt" at the sentencing phase of the trial. *Atkins v. Commonwealth*, 260 Va. 375, 381 (2000).

Huffman further assigns error to the trial court's refusal to admit evidence of Joe's sodomy conviction at sentencing. The trial court excluded a letter from Joe's victim,[8] which detailed the nature of the offense and stated the victim's belief that Joe deserved his fate. The trial court ruled the letter was "in no way" relevant, and did not "mitigate" Huffman's crimes. Given the letter's clear message, excusing Joe's death as deserved, we cannot say that it was improper for the trial court to rule that it was not proper mitigation evidence.

Huffman also argues that the letter was admissible to rebut character evidence the Commonwealth presented at sentencing. In her testimony, Sandra Kreger described Joe as "so innocent and brand new."[9] She went on to say that "Joe respected everybody else," would "give you his last dime," "always contributed," and "never" had to be asked "to do the right thing." She told the trial court that Joe "was about the truth, and that's all he ever wanted you to give him, and that's all he ever gave anybody else."

---

[7] *See Commonwealth v. Shifflett*, 257 Va. 34, 43 (1999) (determining that the factors in mitigation that may be considered in capital murder cases should be available in the determination of a noncapital sentence under Code § 19.2-295.1).

[8] The letter was included as an exhibit with Huffman's sentencing memorandum filed April 17, 2022.

[9] Kreger clarified on cross-examination that by "brand new," she meant "brand new to her." In response to her comment that Joe was "innocent," the trial court permitted Huffman, over the Commonwealth's objection, to ask Kreger whether she knew about Joe's conviction and whether that affected how she saw him. He did not use the letter or its contents.

Peggy Yonce, the victims' mother, testified that her sons would "give you the shirt off of their back" before recounting an anecdote where her sons "spent three hours on a hot road helping someone they didn't know" repair a broken vehicle. Huffman argued to the trial court that this was character evidence that he should be allowed to rebut. The Commonwealth responded that it was impact testimony "describing the type of person" Joe was and "how it was important to them." Though the trial court found that "some" of the witnesses testified about the victims' character, it nevertheless excluded the letter. On appeal, Huffman argues that the witnesses' testimony triggered the admissibility of the evidence of Joe's conviction in rebuttal and that it was error for the trial court to exclude it. Assuming without deciding that Huffman is correct, any error was harmless.

"[Assuming] that the trial court erred, however, does not end our analysis." *Lienau v. Commonwealth*, 69 Va. App. 254, 269 (2018). "Code § 8.01-678 makes 'harmless-error review required in all cases.'" *Commonwealth v. White*, 293 Va. 411, 420 (2017) (quoting *Commonwealth v. Swann*, 290 Va. 194, 200 (2015)). "Non-constitutional error is harmless if other evidence of guilt is so 'overwhelming' and the error so insignificant by comparison that we can conclude the error 'failed to have any "substantial influence" on the verdict.'" *Lienau*, 69 Va. App. at 270 (quoting *Bell v. Commonwealth*, 47 Va. App. 126, 140 n.4 (2005)).

We find the trial court's exclusion of the rebuttal evidence harmless under the circumstances of this case. The trial court found that the letter "in no way mitigates any culpability on behalf of the defendant." Because the court was so clear regarding its position on the evidence, and because no jury was deprived of the opportunity to consider this evidence during sentencing, the trial court's record clearly indicates that admitting the proposed evidence would not have affected Huffman's sentence. *See Lavinder v. Commonwealth*, 12 Va. App. 1003, 1005 (1991) (en banc). *Cf. Deville v. Commonwealth*, 47 Va. App. 754 (2006) (holding there was no prejudice

where the trial court found that earlier disclosure of exculpatory material would not have changed the outcome of the trial).

## II. Admission of expert testimony

Huffman argues that the trial court erred in permitting the Commonwealth's witnesses to testify about factual issues "outside the scope" of their expertise or personal knowledge. Huffman challenges the admission of testimony pertaining to trajectory analysis conducted by Detective Perkins, testimony by Detectives Perkins and Jacques about the safe use and storage of firearms and ammunition, Detective Handy's characterization of Huffman's injury as likely a slashing wound rather than a stabbing wound, and Dr. Bowers's testimony that Fred's injuries would have caused paralysis and difficulty speaking. Huffman concedes that no appropriate or timely objection was raised in the trial court but asks this Court to review his assignment of error under the ends of justice exception to Rule 5A:18.

"'The ends of justice exception is narrow and is to be used sparingly,' and applies only in the extraordinary situation where a miscarriage of justice has occurred." *Holt v. Commonwealth*, 66 Va. App. 199, 209 (2016) (en banc) (quoting *Redman v. Commonwealth*, 25 Va. App. 215, 220-21 (1997)). Whether to apply the ends of justice exception involves two questions: "(1) whether there is error as contended by the appellant; and (2) whether the failure to apply the ends of justice provision would result in a grave injustice." *Commonwealth v. Bass*, 292 Va. 19, 27 (2016) (quoting *Gheorghiu v. Commonwealth*, 280 Va. 678, 689 (2010)).

These two requirements must remain distinct: "if every trial court error also constitutes a grave or manifest injustice," then the ends of justice exception will swallow "the rule requiring a contemporaneous objection." *Brittle v. Commonwealth*, 54 Va. App. 505, 513 (2009). Accordingly, "[t]he burden of establishing a manifest injustice is a heavy one, and it rests with the appellant." *Holt*, 66 Va. App. at 210 (quoting *Brittle*, 54 Va. App. at 514). Thus, the "ends of

justice" exception to Rule 5A:18 "requires proof of an error that was 'clear, substantial[,] and material.'" *West v. Commonwealth*, 43 Va. App. 327, 338 (2004) (quoting *Brown v. Commonwealth*, 8 Va. App. 126, 132 (1989)). The appellant "must affirmatively show that a miscarriage of justice has occurred, not that a miscarriage *might* have occurred." *Id.* (quoting *Redman*, 25 Va. App. at 221).

In the instant case, Huffman does not attempt to show that a miscarriage of justice has occurred. Instead, he merely states that he "may pursue this on appeal because the ends of justice require it." The entirety of Huffman's argument is that "[i]t is highly likely that the jury relied on this testimony when resolving factual discrepancies, and the testimony likely carried significant weight due to the [witness's] experience." *See Redman*, 25 Va. App. at 222 ("[An] appellant must demonstrate that he or she was convicted for conduct that was not a criminal offense or the record must affirmatively prove that an element of the offense did not occur."). Given this failure to properly invoke the ends of justice exception to Rule 5A:18, we will not address this assignment of error.

### III. Huffman's jury instruction

"A reviewing court's responsibility in reviewing jury instructions is to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises." *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019) (quoting *Darnell v. Commonwealth*, 6 Va. App. 485, 488 (1988)). We review a trial court's decisions in giving and denying requested jury instructions for abuse of discretion. *Id.* "[W]hen reviewing a trial court's refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction." *Dandridge v. Commonwealth*, 72 Va. App. 669, 676 (2021) (quoting *Lienau*, 69 Va. App. at 260). "[J]ury instructions are proper only if supported by the evidence, and more than a scintilla of evidence is required." *Watson v. Commonwealth*, 298 Va. 197, 207 (2019) (quoting

*Payne v. Commonwealth*, 292 Va. 855, 869 (2016)); *see Williams v. Commonwealth*, 64 Va. App. 240, 246 (2015) ("Although a defendant 'is entitled to an instruction upon his theory of the case,' this rule can be invoked '[o]nly when such instruction is supported by some appreciable evidence.'" (quoting *Harris v. Commonwealth*, 134 Va. 688, 695 (1922))). "[A] court may exercise its discretion and properly exclude an instruction that both correctly states the law and is supported by the evidence when other granted instructions fully and fairly cover the relevant principle of law." *Payne*, 292 Va. at 869 (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 229 (2013)).

While the jury was instructed on all applicable law, including manslaughter, Huffman argues that it is "highly doubtful the jurors understood" their ability to find him guilty of manslaughter even had they believed his conduct did not constitute self-defense. Huffman argues that the jury question—regarding malice and a heat of passion provoked by words—clearly indicates that his instruction would have ameliorated the other instructions' ambiguity. To that end, he contends that the trial court should have permitted his "imperfect self-defense" instruction. We disagree.

First, we reject Huffman's assertion that the jury's verdict could be inferred from questions it asked during its deliberations. "A jury speaks only through its unanimous verdict. 'The verdict, as finally agreed upon and pronounced in court by the jurors, must be taken as the sole embodiment of the jury's act.'" *Kennemore v. Commonwealth*, 50 Va. App. 703, 708-09 (2007) (citation omitted). "In Virginia, as elsewhere, the deliberations of jurors 'during retirement, their expressions, arguments, motives, and beliefs, represent that state of mind which must precede every legal act and *is in itself of no jural consequence*.'" *Id.* at 709 (quoting 8 Wigmore, *Evidence* § 2348, at 680 (McNaughton rev. 1961)). "A question posed to the court during deliberations, after all, could suggest as little as the tentative views of a single juror." *Id.* Thus, the question the jurors posed carries no probative value.

Second, Huffman's assertion that the jury was insufficiently instructed on the law is not supported by the record. The jury was instructed on the different grades of homicide, as well as self-defense, heat of passion, and malice.[10] Huffman argues that these instructions failed to account for circumstances where one acted "unreasonably" in response to an "unreasonable fear." We have previously held, however, that imperfect self-defense is akin to "the law of voluntary manslaughter as it currently stands in the Commonwealth." *Connell v. Commonwealth*, 34 Va. App. 429, 438-39 (2001). Accordingly, the given instructions fully equipped the jury to render a verdict according to Huffman's version of events, provided that it credited his version.[11] *See Turner v. Commonwealth*, 23 Va. App. 270, 277 (1996) (holding that by rejecting the lesser-included offense of second-degree murder, the jury necessarily rejected the factual basis upon which it might have rendered a voluntary manslaughter verdict); *see also Connell*, 34 Va. App. at 439 (holding that the trial court did not err in denying the appellant's proffered jury instruction on imperfect self-defense, and emphasizing that the trial court instructed the jury on voluntary manslaughter, heat of passion, and the distinction between murder and manslaughter). Huffman's complaints that a well-instructed jury could be *better* instructed do not demonstrate reversible error.

Huffman's proposed instruction would have served only to include more terminology. Rather than clarify matters for the jury, it is likely that Huffman's proposed instruction would *itself* create confusion, by providing the jury with seemingly disparate standards such as considering an "adequate," rather than a "reasonable" fear. A trial court does not abuse its discretion when it

---

[10] The jury was given a "waterfall" instruction that set forth the specific elements of each grade of homicide in descending order. *See Smith v. Commonwealth*, 296 Va. 450 (2018).

[11] At trial, Huffman relied on *Dandridge v. Commonwealth*, 72 Va. App. 669 (2021), for the proposition that the instruction was a proper statement of law and admissible. The distinction between this case and *Dandridge* is clear, as the trial court in *Dandridge* refused to give a voluntary manslaughter instruction altogether, whereas Huffman simply complains of the court's refusal to give a cumulative instruction.

excludes an instruction that "would have created confusion and would have been misleading." *Hubbard v. Commonwealth*, 243 Va. 1, 15 (1992). Accordingly, we find that the trial court did not err in refusing Huffman's requested instruction.

CONCLUSION

The trial court did not err in excluding evidence of the victims' criminal histories at trial and any error in excluding such evidence at sentencing was harmless. Huffman failed to preserve his assignment of error relating to the admission of certain factual testimony, so we do not address that claim on appeal. Finally, we hold that the trial court did not abuse its discretion in rejecting Huffman's proposed jury instruction. Accordingly, we affirm Huffman's convictions.

*Affirmed.*