PRESENT:  Lemons, C.J., Goodwyn, Mims, McClanahan, Powell, and Kelsey, JJ., and Russell, S.J.

DEANTE LAMAR PAYNE

                                     OPINION BY
v.  Record No. 151524                 JUSTICE WILLIAM C. MIMS
                                  December 29, 2016

COMMONWEALTH OF VIRGINIA

FROM THE COURT OF APPEALS OF VIRGINIA

In this appeal, we consider whether an email sent by the detective investigating a robbery was properly excluded at trial.  We also consider whether a proffered jury instruction loosely modeled on one discussed in *United States v. Telfaire*, 469 F.2d 552 (D.C. Cir. 1972), and endorsed by the United States Court of Appeals for the Fourth Circuit in *United States v. Holley*, 502 F.2d 273 (4th Cir. 1974), was properly refused.

I.  BACKGROUND AND MATERIAL PROCEEDINGS BELOW

In November 2011, Phillip Via responded to an internet advertisement offering a used laptop computer for sale.  Via and the purported seller exchanged mobile phone text messages to arrange a meeting one evening after dark.  Via went to an apartment community to meet the purported seller.  Via parked his car in the community's parking lot under a street light.  He informed the purported seller by text message that he had arrived.  Soon thereafter, a man emerged from an apartment building, told Via that the computer's battery was charging, and invited Via inside to inspect the computer.  His suspicion roused, Via surreptitiously removed his wallet and watch and put them in the center console of his car.  He then followed the man into the apartment building.

The man led Via into a laundry room.  There was a door at each end of the room.  The room was lit by overhead fluorescent lights.  After Via entered the room through one door, and as

he followed the man toward the door at the opposite end, a second man emerged from behind a hot water heater near Via. The second man produced a knife, pressed it against Via's abdomen, and pulled him back against the wall. The first man, whom Via had followed from the parking lot, leaned against the opposite door to prevent anyone entering the room through it.

The men demanded that Via "give it up, give it up, give it up." Via told them that he had only come to inspect the computer and had not brought any money. He told them that if he decided to buy the computer after inspecting it, he was going to go to the bank to get the money and complete the sale. The man with the knife searched Via's pockets but only found his keys and mobile phone. The men insisted that they knew Via had the money and demanded that he give it to them. The first man, whom Via had followed from the parking lot, produced a semi-automatic handgun and pointed it at him. Via again pleaded that he had not brought any money and noted that the man with the knife had just searched his pockets. The standoff continued for a few minutes before the two men exited through the door opposite Via, taking his mobile phone and warning that they would shoot him if he followed them.

Via thereafter fled through the door he had entered. A passerby responded to his calls for help and lent him a mobile phone. Via called 911 and Officer John Musser promptly responded. Via told Officer Musser that the man he had followed from the parking lot was black, about 5'10" tall and 160 pounds, with very short hair. He also provided the phone number he had exchanged text messages with to arrange the meeting.

Officer Musser searched and photographed the scene, including the parking lot and laundry room. He recovered a latent shoe print in the dust on the floor behind the hot water heater. He dusted the doorknobs, hot water heater, and a dryer for fingerprints but was unable to collect any of evidentiary value.

In January 2012, Detective Keisha Saul interviewed Deante Lamar Payne. Payne lived at a residence associated with the IP address from which the internet advertisement had been posted. Payne's residence was less than a quarter of a mile from the apartment building where Via was robbed. Payne denied any involvement in the robbery. He said that his cousin, who did not have internet access, had come to him with a laptop computer and asked Payne to post the advertisement online. Payne suggested that his cousin may have perpetrated the robbery with a friend Payne knew only as Booney. Detective Saul later identified Booney as Mark Rosser.

Detective Saul thereafter interviewed Via. She showed him a series of six photographs, one at a time, asking for each whether he recognized the person it depicted before continuing to the next. He identified Payne's photograph as depicting the man whom he had followed and who had pointed the handgun at him.

In February 2012, Via was a witness at the preliminary hearing of a suspect believed to be the man who had held the knife. When he entered the courtroom, Via saw Payne sitting in the audience and immediately recognized him as the man who had held the handgun. When Via was asked during his testimony at the preliminary hearing if he recognized the man who had held the handgun, he identified Payne in the audience. Officer Musser subsequently arrested Payne at the hearing.[1] Payne was subsequently indicted on one count of robbery and one count of use of a firearm in the commission of a felony.

On the evening of the preliminary hearing, Detective Saul received an email from an assistant Commonwealth's attorney recounting Via's identification of Payne. Detective Saul

---

[1] Following arrest and while detained at the Roanoke County jail, Payne made a phone call that was recorded by the sheriff's office. The Commonwealth introduced the recording and played an excerpt at trial. Payne and the Commonwealth dispute the meaning and significance of what Payne said on the recording. For reasons stated below, we need not consider the recording to decide the issues presented in this appeal.

3

replied with an email in which she wrote that Via had identified Payne in the photo lineup the previous month. However, she expressed her reservations because she felt that Payne looked like Rosser, whom she also considered to be a possible suspect. She wrote that she had thought Payne was truthful in her interviews and was not certain that he was involved.

In May 2012, Detective Saul again interviewed Via. She showed him a second series of six photographs, again one at a time, and again asking whether he recognized the person each depicted before continuing to the next. This series of photographs included one of Rosser, as well as the photograph of Payne that Via had earlier identified as depicting the man who had held the handgun. Rosser's photograph was the second in the series and Payne's was the fifth. Via rejected the photograph of Rosser before again identifying Payne.

At trial, Officer Musser and Detective Saul testified that there was no forensic evidence connecting Payne to the laundry room where Via was robbed. The phone number used in the internet advertisement could not be connected to him. The shoe print taken from behind the hot water heater did not match his shoes. No fingerprints connected him to the scene. No handgun was ever recovered, although Detective Saul had searched Payne's residence for shoes. However, Via again testified that Payne was the man who had held the handgun during the robbery.

During cross-examination, Payne extensively challenged Via's eyewitness identification. Via testified that he had never met Payne before. He testified that the meeting occurred after dark, although the parking lot was well lit. He testified that he had watched the man approach from halfway between the apartment building and his car but exchanged only a few words, at a distance of three to five feet, before the man turned to go back inside. He testified that when the man with the knife pulled him back against the wall, he looked away from the man he was following and down at the knife. He testified that part of the fluorescent light was out above him and the man with the knife, making that end of the laundry room somewhat dim. He testified that the man who

4

produced the gun was at the other end of the room, about seven to eight feet away, but that he moved closer when he pointed the gun. Via testified that he was scared. He testified that he watched the man with the knife while that man searched his pockets. He testified that although he looked at the handgun when the man he had followed produced it, he could still see that man's face.

Payne also cross-examined Detective Saul. She testified that she thanked Payne for his honesty after interviewing him. She testified that at times during her investigation, she had thought others, including Rosser, may have been the man who had held the handgun. She testified that she did not investigate one of those suspects and did not attempt to locate or interview Rosser. She testified that she responded to the email she received from the assistant Commonwealth's attorney on the evening of the knife-wielding suspect's preliminary hearing by sending photographs of Rosser, writing that she believed he and Payne resembled each other, and expressing her belief that Payne had been honest during her interviews.

Payne then moved to admit Detective Saul's email into evidence.[2] He argued that the email was relevant because it "shows the timeline of the investigation" and "when she got the

_____

[2] In its entirety, and numbering the sentences for ease of reference, the email reads:

> [1] Actually I gave Via a photo line-up with [Payne] and he did pick him out. [2] The problem is, [Payne] looks like [his cousin's] friend [Rosser] who we initially thought was helping [Payne's cousin] with the crime. [3] Attached [are] some pictures I found of [Rosser]. [4] I felt very unfortable [sic] getting warrants on [Payne] just off of a photo id since I had interviewed him on multiple occasions and he appeared to be truthful. [5] To date, I'm still not sure he was involved? [6] I have all of this documented in my case file. [7] Unfortunately I ran out of time before leaving [for forensics training] and didn't put it in a supplement form. [8] I don't have access to mobile while [at training] therefore I can't type a supplement. [9] I don't return to work until April 15th. [10] I told [Officer Musser] that if he needed my case file to get Sgt. Herrick to make him a copy of it. [11] If you need something before I return let me know and I'll do my best to make arrangements to get it to you. [12] If you need a supplement, I can go in over the weekend and try to get it done.

pictures [of] Mr. Rosser.  It also shows her thoughts about" Rosser and Payne as suspects.  "It has relevancy to the evidence collected, how it's presented . . . ."  The circuit court denied the motion, ruling that he had elicited that evidence during his cross-examination.  Payne then offered to redact the email and the court agreed to consider a redacted version.

Payne originally proposed to redact only sentence 5, which the court rejected.  It ruled that neither when Detective Saul returned to work nor the person to whom she passed the case when she left for training was relevant, so sentences 7 through 12 were inadmissible.  It ruled that the substance of sentences 1, 2, and 3 had already been elicited through testimony but they could be admitted.  It ruled that sentences 4 and 5 were not relevant.  Even though their substance, too, had already been elicited through testimony because the Commonwealth had not objected to Payne's questions, they were inadmissible.  It ruled that sentence 6 could be admitted.  Payne then prepared a redacted version of the email including only sentences 1 through 3, preserving his objection to the exclusion of the rest of the email.

At the conclusion of the evidence, Payne proffered a jury instruction loosely modeled on that given in *Telfaire*, 469 F.2d at 558-59, which he argued was necessary because "[t]he jury needs to be apprised of the factors that affect eyewitness testimony."[3]  The circuit court noted that

---

[3] The instruction Payne proffered reads:

> The Court instructs the jury that one of the disputed issues in this case is the identification of the defendant as the person who committed the offense(s) charged in the indictment.  The Commonwealth has the burden of proving this issue beyond a reasonable doubt.
> In considering whether the Commonwealth has proven beyond a reasonable doubt that the defendant was the person who committed the offense(s) charged in the indictment, you may consider the following with regard to an identification witness's testimony:
> (1) the witness's opportunity to observe the person(s) committing the crime, which includes the amount of time of the observation and the physical conditions such as lighting, distance, or obstructions present at the time of the observation;

the Court of Appeals of Virginia had affirmed the refusal to give a *Telfaire* instruction in *Johnson v. Commonwealth*, 2 Va. App. 447, 457, 345 S.E.2d 303, 308-09 (1986), holding that it was argumentative and duplicative of other jury instructions informing the jury of "the presumption of innocence, the Commonwealth's burden of proof, and the jury's function in determining the credibility of the witnesses." Payne argued that the *Telfaire* instruction, or an instruction using similar words, had been adopted by most federal courts and incorporated into the federal model jury instructions and model jury instructions of several states. The Commonwealth responded that, as in *Johnson*, Payne's proffered instruction was duplicative of instructions taken from the Virginia model jury instructions that the court had already granted.

The court refused Payne's proffered instruction, ruling that "all the legal principles applicable to this case, and, in particular, those pertaining to the issues relevant to eyewitness identification, are covered by" jury instructions already granted. Further, the proffered instruction "has the potential of, if not misleading the trier of fact, at least confusing them because, in deciding the issues of the case, the trier of fact is required to consider all the evidence." The proffered instruction "gives [the jury] a four-point checklist of factors or types of evidence they should consider on the issue of eyewitness testimony, and I think that is inaccurately []limiting insofar as what the jury is . . . required to do in this case." In other words, the jury could

---

(2) the witness's degree of attention at the time of the observation, whether the witness was under stress, fear or similar situations, and whether the witness had occasion to see or know the person in the past;
(3) whether the witness gave a description of the person after the crime and if so, the accuracy of such description and the length of time after the offense that the description was given; and
(4) whether the witness made any subsequent identification of the person after the offense, the circumstances surrounding such subsequent identification, the witness's level of certainty at such subsequent identification, and the time between the offense and the subsequent identification.

7

incorrectly conclude that Payne's proffered instruction meant they could consider *only* those 4 factors when weighing Via's testimony.

The jury thereafter deliberated and found Payne guilty. The circuit court sentenced him to a term of six years' active incarceration on the robbery count and three years' active incarceration on the firearm count.

Payne thereafter appealed to the Court of Appeals arguing, among other things, that the circuit court erred by excluding the redacted portion of Detective Saul's email and by refusing his proffered instruction. The Court of Appeals affirmed the circuit court's judgment by published opinion. *Payne v. Commonwealth,* 65 Va. App. 194, 223, 776 S.E.2d 442, 456 (2015).

We awarded Payne this appeal.

## II.  ANALYSIS

## A.  EXCLUSION OF DETECTIVE SAUL'S EMAIL

In one assignment of error, Payne asserts that the circuit court erred by excluding the redacted portion of Detective Saul's email. He argues that under *Workman v. Commonwealth*, 272 Va. 633, 647, 636 S.E.2d 368, 376 (2006), evidence relating to the reliability, thoroughness, and good-faith of a police investigation is admissible. He contends that the redacted portion of the email should have been admitted to discredit the investigation. Further, he continues, the email should have been admitted under *Massey v. Commonwealth*, 230 Va. 436, 442, 337 S.E.2d 754, 757-58 (1985), because it showed that there was an alternative suspect who looked like Payne but who was never investigated. The redacted portion of the email also revealed Detective Saul's doubts about Via's identification of Payne and her skepticism that Payne was involved in the robbery because she believed that he had been honest in her interviews. According to him, her doubts raise questions, including why she didn't investigate Rosser and why she used the same photograph of Payne in the second photo lineup, which included Rosser's photograph. Further,

8

the email showed when Detective Saul had doubts—i.e., after the first photo lineup and Via's in-court identification at the knife-wielding suspect's preliminary hearing—and that the investigation was under time pressure. He asserts that Detective Saul's testimony on the stand was not as compelling as her actual email was, which the jury could have taken into the jury room as an exhibit if it had been admitted.

This Court reviews a trial court's ruling admitting or excluding evidence for abuse of discretion. *Lawlor v. Commonwealth*, 285 Va. 187, 229, 738 S.E.2d 847, 871 (2013).

Taking each of the excluded sentences in turn, we conclude the circuit court did not abuse its discretion by excluding sentences 4 and 5. Whether Detective Saul believed Payne when he denied participating in the robbery is an opinion on the ultimate issue of fact, i.e., whether he was guilty or not. *See Ward v. Commonwealth*, 264 Va. 648, 652, 570 S.E.2d 827, 830 (2002). Opinion on the ultimate issue of fact is inadmissible because it invades the province of the jury. *Id.* (collecting cases). Moreover, even if these sentences were admissible, Payne elicited Detective Saul's skepticism of his guilt multiple times on cross-examination because the Commonwealth failed to object to them then, a fact that Payne himself observed through counsel when the circuit court ruled against him. A trial court may exercise its discretion to exclude evidence that is repetitious and cumulative. *Boone v. Commonwealth*, 285 Va. 597, 602, 740 S.E.2d 11, 13 (2013).

While a defendant may introduce evidence discrediting the police investigation, *Workman*, 272 Va. at 646-47, 636 S.E.2d at 375-76, sentences 7 through 12 do not fall within that description. Despite Payne's characterization, sentence 7 does not suggest that the investigation was rushed. Rather, read in context, it merely indicates that Detective Saul did not have time to complete a supplement form before leaving for forensic training. Sentence 10 indicates that the investigation was continuing in her absence, so her departure does not suggest an artificial

9

deadline. Sentences 8, 9, 11, and 12 are purely administrative, dealing only with when Detective Saul was due to return from training and when she could complete a supplement form if the assistant Commonwealth's attorney needed one. Thus, the circuit court did not abuse its discretion when it excluded sentences 7 through 12.

Finally, the circuit court did not exclude sentence 6, because it did not require Payne to redact that sentence. When reviewing sentence 6, it ruled that "I don't have any problem with that." When Payne asked whether only sentences 4 and 5 had to be redacted, the court reiterated, "No. Then everything beginning with 'Unfortunately'"—i.e., sentence 7. In any event, even if the court had excluded sentence 6, doing so would not have been an abuse of discretion because it is irrelevant: whether Detective Saul *documented in the case file* her opinion of Payne's honesty and his resemblance to Rosser is not evidence having "any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence." Rule 2:401.[4]

Accordingly, there is no error in the judgment of the Court of Appeals finding no abuse of discretion in the circuit court's evidentiary ruling.

### B. REFUSAL OF PAYNE'S PROFFERED INSTRUCTION

In his other assignment of error, Payne asserts that the circuit court erred by refusing his proffered instruction modeled on *Telfaire*. He argues that the case against him turned entirely on Via's eyewitness identification, so the reliability of that identification was critical. However, he

---

[4] As noted above, the fact that Detective Saul believed Payne's denials is inadmissible because it invades the province of the jury, and was also elicited during cross-examination because the Commonwealth failed to object. The fact that she believed Payne resembles Rosser was also elicited in her testimony multiple times on cross-examination and within the unredacted portion of the email. These facts themselves were therefore already in evidence. Sentence 6, which states only that this information was in her case file on the evening of the knife-wielding suspect's preliminary hearing, is not relevant to a fact in issue even as it relates to the timing of the investigation. The fact that the investigating detective had *included* information in her case file does not suggest a lack of reliability, thoroughness, or good-faith in the then-ongoing police investigation.

10

argues, it was night when Via saw the man who held the handgun; the parking lot where Via first saw the man was dim; the man was black and Via is white, and there is scientific evidence that cross-racial identifications are less reliable; Via was under stress in the laundry room and distracted by the knife and handgun, and there is scientific evidence that stress impairs memory; the first photo lineup was two months after the robbery; Detective Saul did not show Rosser's photograph to Via until the second photo lineup, which used the same photograph of Payne that Via had already seen in the first lineup, and there is scientific evidence that Via may have remembered Payne's photo, rather than Payne himself, in the second lineup.

The proffered instruction is a correct statement of the law, Payne continues, and a trial court errs when it refuses an instruction supported by the evidence. He argues that the Court of Appeals erred when it affirmed the circuit court's ruling on the ground that his instruction was duplicative of other, granted jury instructions that informed the jury about witness credibility because the reliability of an eyewitness's identification is different from witness credibility. An eyewitness can sincerely and honestly believe that he recognized the suspect even though forensic evidence proves that the eyewitness is incorrect. A witness credibility instruction therefore does not overlap with an eyewitness identification reliability instruction.

Payne also contends that the proffered instruction was not duplicative of the granted jury instructions because none of them informed the jury that it could take into account the circumstances surrounding the photo lineups and subsequent identifications, the police investigation procedures, the time between the crime and initial identification, whether the eyewitness was previously familiar with the suspect, and the stress the eyewitness was under when he saw the suspect he later identified. Credibility does not cover these factors.

Payne argues that this Court left open the possibility of a separate eyewitness identification reliability instruction in *Commonwealth v. Daniels*, 275 Va. 460, 463-64, 657 S.E.2d 84-85, 87

11

(2008). Under *Daniels*, he continues, a reliability instruction is particularly warranted where police identification procedures are suggestive. He asserts that Detective Saul's lineup procedures in this case were suggestive: she used the same photograph of Payne in both lineups and did not show him a photograph of Rosser until after he had identified Payne in the first lineup and at the preliminary hearing.

Finally, Payne specifies two points made by the Court of Appeals and asserts that they are especially egregious. The first point is its claim that nothing in the record established that Via and Payne were of different races. He argues that the cross-racial nature of the identification was raised to the circuit court when the parties argued the jury instructions; further, the trial was recorded and the video shows that Via is white and Payne is black. Although the *Telfaire* instruction does not address race, he contends that scientific evidence establishes that cross-racial identification is less reliable.

The second point is the court's opinion that the proffered instruction risked confusing the jury and invaded the province of the jury by limiting the factors it could consider, thereby improperly commenting on the evidence. Payne argues that the Fourth Circuit considered and rejected these concerns when it approved the *Telfaire* instruction in *Holley*, and the instruction has been adopted by many jurisdictions in one form or another. If the view of the Court of Appeals prevails, Payne concludes, no *Telfaire* instruction could ever be given in Virginia.

We disagree with each of Payne's arguments.

This Court

> review[s] jury instructions to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises. This is a mixed question of law and fact. It is error to give an instruction that incorrectly states the law; whether a jury instruction accurately states the relevant law is a question of law that we review de novo. However, jury instructions are proper only if supported by the evidence, and more than a scintilla of evidence is required. When

12

reviewing a trial court's refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction.

*Lawlor*, 285 Va. at 228-29, 738 S.E.2d at 870-71 (internal citations and quotation marks omitted). "Nevertheless, a court may exercise its discretion and properly exclude an instruction that both correctly states the law and is supported by the evidence when other granted instructions fully and fairly cover the relevant principle of law." *Id.* at 256, 738 S.E.2d at 887 (internal quotation marks omitted).

As an initial matter, Payne's proffered instruction did not include racial differences between the eyewitness and the suspect as a factor for the jury to consider. Further, while Payne did point out a racial difference between Via and Payne to the jury during his opening statement, he did not argue that cross-racial identification is less reliable during his argument on the instruction. Accordingly, Payne failed to preserve the issue of cross-racial identification for appeal. Rule 5A:18, Rule 5:25.[5]

We also do not consider Payne's assertion that the police procedures leading to Via's identification were suggestive. When a defendant asserts that the police have obtained an eyewitness identification through the use of suggestive procedures, constitutional due process requires the court to conduct a hearing to determine whether the procedures used actually were suggestive. *Perry v. New Hampshire*, 565 U.S. 228, 241 (2012). If it determines that they were, the court must then determine whether other factors support the reliability of the identification independent of the impermissible procedures. If it concludes that they do not, it must exclude the identification as unreliable as a matter of law. *Id.* at 238-40.

In this case, Payne moved to suppress all pre-trial identifications by Via on the ground that the procedures used to obtain them were suggestive. After multiple hearings, the circuit court

---

[5] The additional comments by the Court of Appeals on the evidence of racial difference in the record are unnecessary.

13

found that the procedures were not suggestive and denied Payne's motion. Payne does not challenge this ruling in his appeal.

Taking Payne's remaining arguments in turn, we disagree with his assertion that the granted jury instructions were insufficient to inform the jury that it could consider the reliability of Via's identification. The first paragraph of his proffered instruction is identical, word-for-word and down to the punctuation, to granted Jury Instruction 4. The remainder of the proffered instruction is adequately stated by Jury Instruction 1. Jury Instruction 1 informed the jury that

> you are the judges of the facts, the credibility of the witnesses, and the weight of the evidence. You may consider the appearance and manner of the witnesses on the stand, their intelligence, *their opportunity for knowing the truth and for having observed the things about which they testified*, their interest in the outcome of the case, their bias, and, if any have been shown, their prior inconsistent statements, or whether they have knowingly testified untruthfully as to any material fact in the case.

> . . . .

> You are entitled to use your common sense in judging any testimony. From these things and all the other circumstances of the case, you may determine which witnesses are more believable and weigh their testimony accordingly.

Despite Payne's argument to the contrary, an instruction that the jury may consider eyewitnesses' "opportunity for knowing the truth and for having observed the things about which they testified" *does* inform it that it may consider not only whether the eyewitness honestly believes what he or she testifies to on the stand, but also whether he or she had the capacity and opportunity to accurately and reliably form that belief.

Indeed, as the circuit court noted, the very specificity of Payne's instruction counseled against its use, in the form and using the precise language he proffered. The proffered instruction would have focused the jury's attention on four enumerated factors, thereby suggesting that those four factors were exclusive or at least entitled to special consideration or undue weight. While it

14

may be appropriate during closing argument for each *party* to focus the jurors' attention on the evidence it prefers them to consider during their deliberations, it is not appropriate for the *court* to do so in a jury instruction because, under the law of Virginia, the jury is free to weigh the evidence how it chooses. *See*, *e.g.*, *Andrews v. Commonwealth*, 280 Va. 231, 301, 699 S.E.2d 237, 277 (2010) (noting that issues of the weight of the evidence are questions for the jury). Thus, because the instruction failed to inform the jury that it could also consider any other circumstances it believed were important in weighing the testimony of the eyewitness, the form and language of Payne's proffered instruction could reasonably be construed to contradict Jury Instruction 1, which correctly informed the jury of its role as judge of the weight of the evidence.

Despite the inference Payne draws from the opinion of the Court of Appeals, this conclusion does not mean that no jury instruction modeled on *Telfaire* can ever be properly given in Virginia. To the contrary, our holding today is no different than what we held in *Daniels*. There we said,

> [w]e have not adopted a rule . . . which requires a cautionary instruction on eyewitness identification in every case in which it is requested and the identification of the defendant is central to the prosecution's case. Neither have we opined that such an instruction would never be appropriate, nor that a court would abuse its discretion by granting such an instruction.

275 Va. at 465, 567 S.E.2d at 86. This remains the law of the Commonwealth. It is not difficult to foresee a defendant proffering a jury instruction similar to Payne's, but drafted to avoid the problem of focusing the jury's attention on a limited number of factors affecting the reliability of an eyewitness identification, thereby seemingly elevating the importance of those factors vis-à-vis similar factors not included in the proffered instruction. Provided that such an instruction is supported by the evidence, it would correctly state the law and a trial court would not err by giving it, at its discretion. *See Velasquez v. Commonwealth*, 276 Va. 326, 330, 661 S.E.2d 454, 456-57

15

(2008) (finding error when court's instruction was an incorrect statement of law). We therefore reject Payne's assertion that affirming in this case would effectively prohibit the use of a *Telfaire* instruction in Virginia.

Through his thorough cross-examination of Via, Payne successfully laid several facts before the jury in this case that could have led it to conclude that Via's identification was not reliable. The jury's choice not to do so is not attributable to a defect in the court's instructions. Accordingly, there is no reversible error in the judgment of the Court of Appeals affirming the circuit court's refusal of Payne's proffered instruction.

### III. CONCLUSION

For the reasons set forth above, we conclude that the Court of Appeals did not err by affirming the judgment of the circuit court. We therefore will affirm the judgment of the Court of Appeals.

*Affirmed*.