COURT OF APPEALS OF VIRGINIA

Present:   Judges O'Brien, AtLee and Malveaux
Argued at Norfolk, Virginia

UNPUBLISHED

JEREMY TODD PETTWAY

v.      Record No. 1212-22-1

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
JUDGE RICHARD Y. ATLEE, JR.
MARCH 19, 2024

FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Gary A. Mills, Judge

Charles E. Haden for appellant.

Virginia B. Theisen, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.

Following two jury trials, the circuit court convicted Jeremy Todd Pettway of conspiracy to

commit first-degree murder, first-degree murder, use of a firearm in the commission of a felony, and

maliciously shooting into an occupied dwelling.  On appeal, Pettway challenges the sufficiency of

the evidence to sustain his convictions.  Additionally, he contends that the circuit court erred by

denying his motion to exclude certain text messages and by granting the Commonwealth's motion

"seeking to limit evidence and argument concerning alleged third-party guilt."  Finally, he contends

that the circuit court erred by instructing the jury on concert of action.  Finding no reversible error,

we affirm the circuit court's judgment.

## I. BACKGROUND

On appeal, we review the evidence "in the 'light most favorable' to the Commonwealth,

the prevailing party in the trial court."  *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022)

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

(quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

A grand jury indicted Pettway for conspiracy to commit first-degree murder, first-degree murder, use of a firearm in the commission of a felony, and maliciously shooting into an occupied dwelling. A jury convicted Pettway of conspiracy but could not reach a unanimous verdict on the other charges, resulting in a mistrial. Following a second trial, another jury convicted Pettway of the remaining charges.

The evidence at the second trial established that in 2021, Pettway worked at the post office. His coworkers included Jacqueline Shabazz ("Jacqueline"[1]), Tashara Jackson, Christopher Carter, and Ada Malone. Jacqueline lived in Newport News with her children and husband, the victim in this case, Salahuddin Shabazz ("Salahuddin"). Jacqueline was having a surreptitious affair with Carter, and Pettway and Jackson were also sleeping together. Additionally, Jacqueline and Jackson had an ongoing feud that dated back to when Jackson came to work at the same post office branch in 2018.

On April 1, 2021, Jacqueline had an "altercation" with Jackson when they crossed paths at a nail salon. After the argument, Jacqueline slashed a tire on Jackson's SUV that was parked outside. The next day, Jacqueline went on a weekend vacation with Salahuddin, during which time she and Carter secretly called each other and exchanged text messages expressing their mutual affection.

---

[1] We refer to individuals by their last name, except for Jacqueline and her husband, the victim.

When she and Salahuddin returned home on April 6, Jacqueline found her car vandalized. Someone, she suspected Jackson, had slashed its tires, spray painted "Whore" on it, and put a candy bar in the fuel tank. Later that day, Carter told Jacqueline that Jackson was hosting a party at a restaurant. Suspecting that Jackson had damaged her vehicle, Jacqueline took Salahuddin to the restaurant to confront her. Jacqueline and Jackson fought in the parking lot of the restaurant while Salahuddin pointed a Taser at onlookers and warned them not to intervene. Jacqueline and Salahuddin returned home after the fight. Fearing that Jackson might harm her family, Jacqueline took her children to spend the night at a hotel in another county.

Around 1:00 a.m. on April 7, an intoxicated Salahuddin briefly visited his family at the hotel before driving home. After Salahuddin departed, Jacqueline spoke to him by phone until around 1:50 a.m., when he arrived home and his phone ran out of power. Around 2:00 a.m., Salahuddin called Jacqueline and said that he was resting on the living room couch and charging his phone. Around 2:13 a.m., during the phone call, Jacqueline heard a man knock at the door of her home. Salahuddin asked, "What's up?" and the person said "Charles." When Salahuddin opened the door, Jacqueline heard gunshots. Jacqueline immediately hung up and called 911.[2]

Soon thereafter, police officers arrived at the home and found Salahuddin's body on the floor by the front entrance; he had suffered four gunshot wounds, including two in the head. Police collected four empty ".380" bullet cartridge casings nearby. Although there was a surveillance camera inside the home, it did not record the incident because Salahuddin had unplugged it the day before the shooting.

When Jacqueline got home, shortly after the police arrived, she reported that she believed that Jackson had murdered Salahuddin due to their recent fight. Law enforcement investigated

---

[2] The Commonwealth introduced 911 phone call records at trial establishing that Jacqueline called police just before 2:13 a.m., and the call originated from the county where her hotel was located, not the county where she and Salahuddin lived.

Jacqueline and tested her hands for gunshot residue. They also identified Pettway and Jackson as suspects.

Later that day, detectives interviewed Pettway about the shooting. Pettway, who was in a sexual relationship with Jackson, did not acknowledge this relationship, claiming only that he and Jackson were "coworkers." He claimed they last communicated two weeks before the incident. On April 20, 2021, police executed a search warrant for Pettway's residence and vehicle but did not collect any evidence. Police subsequently executed search warrants for Pettway's and Jackson's cell phone records.

Newport News Police Detective Trevor Buchanan, an expert in "call detail records" and geolocation analysis, used Pettway's and Jackson's cell phone records to determine their phones' movements and activities around the time of the offense. Additionally, he obtained videos from traffic and surveillance cameras in Pettway's and Jacqueline's neighborhoods. At trial, Detective Buchanan testified that between 1:25 a.m. and 2:01 a.m. on April 4, 2021—the day before Jacqueline found her car damaged—Pettway's and Jackson's phones traveled northwest toward the area of Pettway's residence, where Pettway's phone had activated a nearby cell phone tower. At 2:01 a.m., both phones disconnected from the cellular network and did not reconnect until 2:15 a.m., which Detective Buchanan opined was consistent with the phones being turned off. From 2:15 a.m. through 3:00 a.m., Pettway's and Jackson's phones traveled together toward the Shabazz residence before returning to Pettway's home.

The phone records also showed that at 1:41 a.m. on the night of the murder, about 30 minutes before the shooting, Jackson's phone placed a 20-minute-long call to Pettway's phone. During the call, cameras recorded Jackson's SUV drive from her home to the vicinity of Pettway's residence, where a man speaking on a cell phone approached her vehicle. Between 2:01 a.m. and 2:05 a.m., cameras recorded Jackson's SUV drive to the vicinity of the Shabazz

- 4 -

house.  Cell phone records demonstrated that Pettway's and Jackson's phones traveled together during that time.  Around 2:05 a.m., Pettway's and Jackson's phones disconnected from the cellular network, which Detective Buchanan again explained was indicative that the phones were turned off.  Around 2:13 a.m., a neighbor's surveillance camera recorded a figure approach the front door of the Shabazz residence.  Records of her 911 call introduced at trial established that Jacqueline reported the shooting around 2:13 a.m.  Cameras then recorded Jackson's car return to Pettway's residence, where Pettway's phone activated a nearby cell phone tower around 3:26 a.m.[3]

Detective Buchanan searched Pettway's cell phone, which contained text messages establishing that in the weeks following the shooting, Pettway and Jackson discussed their relationship, the fight at the restaurant, and the shooting.  For example, on April 12, 2021, in response to a message from Jackson indicating that she regarded him as a "true friend" and that she had not "felt so protected since my brother left me," Pettway texted, "I don't do back stabbing shit.  I take head shots I'm coming to u face to face."  Describing the April 6, 2021 fight with Jacqueline at the restaurant, Jackson said, "When I tell u everything you did to protect me he would've did plus wayyy more" and it "definitely would've been worse!  But I felt so helpless that day like who the fuck do I call."  In another message sent shortly after police searched his home and vehicle on April 20, 2021, Pettway told Jackson, "They did [not] take nothing lol . . . Got rid of it."  Continuing, Pettway stated that "Malone" was "worried" because she was the "owner of [the] gun now."  Pettway instructed Jackson, "[D]on't tell no one what happened,"

<hr>

[3] Additionally, Detective Buchanan testified at trial that he obtained about "24 hours' worth" of Carter's cell phone records, from which the detective initially determined that "there was no location data for [Carter's] phone overnight" on April 6 and 7, 2021.  Detective Buchanan later found that Carter's phone made "two data connections"—one around 12:00 a.m. and another around 2:00 a.m. on April 7, 2021—with a cell phone tower near the Newport News Police Department headquarters, which was about eight miles south of the Shabazz residence.

"[k]eep [the] same routine," and "[d]on't forget to delete." The next day, Pettway reminded Jackson to delete their communications and described himself as Jackson's "protector"; Jackson replied, "We both are! Bonnie and Clyde forever!" In response, Pettway texted, "We got this[.] If not[,] See u in your dreams."

On April 22, 2021, police searched Malone's house and found a .380-caliber handgun locked in a safe underneath her bed. At trial, Malone testified that Pettway gave her the handgun two days before the search and had instructed her to give it to police if they came to her home.[4] The Commonwealth introduced sales records at trial demonstrating that Pettway had purchased the handgun in 2014. Forensic testing established that the handgun had fired the bullet cartridge casings found at the crime scene.

Following closing arguments, the jury convicted Pettway of first-degree murder, use of a firearm in the commission of a felony, and maliciously shooting into an occupied dwelling. Pettway appeals his convictions.

II. ANALYSIS

A. *Sufficiency of the Evidence*

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have

---

[4] In addition, Malone testified at trial that she only knew Carter from work; he had never visited her home.

found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "Finally, when reviewing the evidence for sufficiency, we must consider all the evidence admitted at trial, including evidence admitted erroneously." *Wells v. Commonwealth*, 65 Va. App. 722, 726 (2016); *see* Code § 19.2-324.1.

Here, Pettway argues that the evidence was insufficient to sustain his convictions for first-degree murder, use of a firearm in the commission of a felony, and maliciously shooting into an occupied dwelling because the evidence failed to prove that he "was the gunman." Pettway asserts that although the evidence established that his cell phone "traveled to the vicinity" of the Shabazz house around the time of the shooting, such evidence "constituted nothing more than suspicious circumstances," which are insufficient to prove his identity as the perpetrator. Additionally, Pettway contends that the evidence failed to exclude his reasonable hypothesis of innocence that Jackson "or some person other than Pettway" shot the victim. We disagree.

"At trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Shahan v. Commonwealth*, 76 Va. App. 246, 258 (2022) (quoting *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013)). "We review the fact finder's determination regarding the identity of the perpetrator considering 'the totality of the circumstances.'" *Id.* (quoting *Brown v. Commonwealth*, 37 Va. App. 507, 523 (2002)). "Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Holloway v. Commonwealth*, 57 Va. App. 658, 665 (2011) (en banc) (quoting *Coleman v. Commonwealth*, 226 Va. 31, 53 (1983)). "[C]ircumstantial evidence is not viewed in isolation." *Id.* (quoting *Emerson v. Commonwealth*, 43 Va. App. 263, 277 (2004)). "While no single piece

of evidence may be sufficient, the combined force of many concurrent and related circumstances . . . may lead a reasonable mind irresistibly to a conclusion." *Pijor v. Commonwealth*, 294 Va. 502, 512-13 (2017) (alteration in original) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005)). Moreover, "[b]y finding the defendant guilty . . . , the factfinder 'has found by a process of elimination that the evidence does not contain a reasonable theory of innocence.'" *James v. Commonwealth*, 53 Va. App. 671, 681 (2009) (quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 9 (2004)). That conclusion "is itself a 'question of fact,' subject to deferential appellate review." *Id.* (quoting *Haskins*, 44 Va. App. at 9).

Here, the totality of the circumstances supports the jury's finding that Pettway shot Salahuddin. Cell phone records established that at 1:41 a.m. on April 7, 2021, about 30 minutes before the shooting, Jackson's phone placed a 20-minute-long call to Pettway's phone. During the call, cameras recorded Jackson's SUV drive from her home to the vicinity of Pettway's house, where a man speaking on a cell phone approached her vehicle. Cameras then recorded Jackson's SUV drive to the area of the Shabazz residence from 2:01 a.m. to 2:05 a.m., during which time Pettway's and Jackson's phones traveled together. Around 2:05 a.m., Pettway's and Jackson's phones disconnected from the cellular network, which Detective Buchanan opined was consistent with the phones being turned off, which a reasonable factfinder could infer was to prevent location data from being recorded. Around 2:13 a.m., immediately before the shooting, a camera recorded a figure approach the front door of the Shabazz residence. Jacqueline, who was on the phone with Salahuddin, heard gunshots and called 911 around that time. Cameras recorded Jackson's car return to Pettway's residence, where his cell phone activated a nearby cell phone tower around 3:26 a.m. From that evidence, a rational factfinder could conclude that Jackson called Pettway shortly before the murder, picked him up from his house, and drove him

to the Shabazz home, where Pettway had the opportunity to shoot Salahuddin to death before returning to his residence with Jackson. *See Edwards v. Commonwealth*, 68 Va. App. 284, 299 (2017) (affirming first-degree murder conviction where defendant's cell phone location records established his presence at crime scene at the time of victim's murder).

Moreover, it is well-established that "[t]he statements and conduct of an accused after the events that constitute the charged crime may also be relevant circumstantial evidence of intent." *Simon v. Commonwealth*, 58 Va. App. 194, 206 (2011). Further, "[i]t is today universally conceded" that an accused's attempts to conceal the evidence of their crime are "admissible as evidence of consciousness of guilt, and thus of guilt itself." *Palmer v. Commonwealth*, 14 Va. App. 346, 348-49 (1992). Here, text messages on Pettway's phone demonstrated that he and Jackson explicitly discussed the shooting and Pettway's efforts to hide the murder weapon afterward. In addition, a few days after the shooting, Jackson texted Pettway that he was a "true friend" because he had "protected" her from Salahuddin after she fought with Jacqueline in the restaurant parking lot on April 6, 2021. Pettway replied, "I don't do back stabbing shit. I take head shots I'm coming to u face to face." After police searched his property on April 20, 2021, Pettway texted Jackson, "They did [not] take nothing lol . . . Got rid of it," although "Malone"— Jackson's and Pettway's coworker and friend—was "worried" because she was the "owner of [the] gun now." Additionally, Pettway directed Jackson to "tell no one what happened," "[k]eep [the] same routine," and "delete" their communications. Two days later, police seized the handgun used in the shooting from Malone's residence. Records established that Pettway purchased the handgun in 2014, and Malone testified that he gave it to her after the shooting, thus demonstrating that Pettway exercised dominion and control over the murder weapon and hid it from police. The above evidence supports the jury's finding that Pettway, not a third party, shot Salahuddin. *See Shahan*, 76 Va. App. at 258-59 (holding evidence proved defendant's

identity as perpetrator where he had access to the murder weapon and his cell phone location data established likelihood that he was present at the crime scene around the time of the murder).

In sum, the record supports the jury's finding that Pettway committed the offenses. The jury considered the totality of the evidence and reasonably rejected Pettway's theory of innocence that Jackson or another suspect shot Salahuddin. Accordingly, we find no basis to disturb the circuit court's judgment.[5]

### B. *Exclusion of Text Messages*

Before the second trial, Pettway moved to exclude the text messages he exchanged with Jackson after the shooting as irrelevant and hearsay. He maintained that the text messages did not satisfy the adoptive admission hearsay exception because the messages did not specify that Pettway and Jackson killed Salahuddin or "that that's the crime that they're talking about." The circuit court denied the motion.

On appeal, Pettway argues that the circuit court erred in admitting the text messages between him and Jackson under the adoptive admission hearsay exception because his relationship with Jackson created "emotional impediments" that made it "unreasonable" for him "to challenge her statements or argue with her."

---

[5] In his brief, Pettway also contends that the evidence was insufficient to prove that he conspired to commit first-degree murder because "there was no evidence of any sort of agreement, collusion, or discussion in advance" of Salahuddin's murder. But to preserve his objections to the sufficiency of the evidence in a jury trial after "introduc[ing] evidence of his own," a defendant must either move "to strike at the conclusion of all the evidence" or move "to set aside the verdict." *Commonwealth v. Bass*, 292 Va. 19, 33 (2016) (citing *Murillo-Rodriguez v. Commonwealth*, 279 Va. 64, 84 (2010)). Here, Pettway did not preserve his specific argument that the evidence failed to prove an agreement because he did not raise it during his motions to strike the evidence at the first trial, in which he was convicted of conspiring to commit first-degree murder. Accordingly, Rule 5A:18 bars review of the merits of Pettway's arguments challenging the sufficiency of the evidence supporting his conspiracy conviction. Pettway does not invoke the good cause or ends of justice exceptions to Rule 5A:18, and this Court will not do so sua sponte. *Edwards v. Commonwealth*, 41 Va. App. 752, 760 (2003) (en banc).

Nevertheless, "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. Accordingly, "this Court 'will not consider an argument on appeal [that] was not presented to the trial court.'" *Farnsworth v. Commonwealth*, 43 Va. App. 490, 500 (2004) (alteration in original) (quoting *Ohree v. Commonwealth*, 26 Va. App. 299, 308 (1998)). "Specificity and timeliness undergird the contemporaneous-objection rule [and] animate its highly practical purpose." *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019). "Not just any objection will do. It must be both *specific* and *timely* — so that the trial judge would know the particular point being made in time to do something about it." *Id.* (quoting *Dickerson v. Commonwealth*, 58 Va. App. 351, 356 (2011)). "[A] general argument or an abstract reference to the law is not sufficient to preserve an issue." *Banks v. Commonwealth*, 67 Va. App. 273, 285 (2017) (quoting *Edwards v. Commonwealth*, 41 Va. App. 752, 760 (2003) (en banc)). Indeed, "appellate courts will not consider an argument that differs from the specific argument presented to the trial court, even if it relates to the same general issue." *Edwards*, 41 Va. App. at 761 (citing *Floyd v. Commonwealth*, 219 Va. 575, 584 (1978)).

The record establishes that Pettway did not argue in the circuit court that the adoptive admission hearsay exception was inapplicable because his relationship with Jackson made it unreasonable for him to deny the inculpatory assertions the text messages contained. Rather, he raised an alternative argument that the messages did not satisfy the adoptive admission hearsay exception because it was unclear whether they referenced Salahuddin's murder, as opposed to some other crime, and were therefore not relevant. Accordingly, we do not consider the merits of Pettway's argument, which he asserts for the first time on appeal. Pettway does not ask this

Court to invoke the good cause or ends of justice exceptions to Rule 5A:18, and we will not do so sua sponte. *Id.* at 760.

## C. *Third-Party Guilt*

Before the second trial, the Commonwealth moved for the circuit court to prohibit Pettway from introducing evidence and arguing to the jury that Jacqueline or Carter committed the offenses instead of him. In its written motion, citing *Ramsey v. Commonwealth*, 63 Va. App. 341, 354 (2014), the Commonwealth argued that although Pettway had a constitutional right to present a defense, evidence of a third-party's guilt was inadmissible absent a proffer establishing a "trend of facts and circumstances tending *clearly* to point to" the alternative suspect's guilt. The Commonwealth asserted that, based on Pettway's "strategy and arguments from the prior trial," it expected him to attempt to introduce evidence that Jacqueline had "one particle of gunshot residue on her hand" on the night of the shooting, was having an affair with Carter, and had suffered Salahuddin's abuse, which Pettway would argue created a motive for Jacqueline or Carter to murder Salahuddin. Additionally, the Commonwealth asserted that there would be no evidence that Carter was at the scene of the murder or could have accessed the murder weapon. According to the Commonwealth, those circumstances did not "clearly point" to either Jacqueline's or Carter's guilt and, therefore, were inadmissible for that purpose.

At a hearing on the motion, the Commonwealth proffered that during the first trial, Pettway's counsel had Carter stand before the jury so that they could compare him to Pettway and the person depicted in the surveillance videos. Based partially on that evidence, Pettway had argued to the jury that Carter may have committed the offenses. The Commonwealth argued that it was speculative to infer Carter's guilt from that evidence because nothing established that Carter was present during the commission of the crime and could access the murder weapon. Pettway maintained that the jury could infer that Carter was the person depicted in the

surveillance videos based on their resemblance and that Carter had motive to kill Salahuddin due to his affair with Jacqueline.

The circuit court stated that it was unwilling to rule on the motion based on the evidence presented at the first trial, but if the parties proffered what the evidence would be at the second trial, the court would "issue a written opinion laying out what [it] believe[d] the law is" as a "framework" for defense counsel to "gauge[] his argument." In response, the Commonwealth proffered that the evidence would establish that Jacqueline was in another county when she called 911 and, although police found "one particle of gunshot residue on her hand," she may have acquired it from touching police officers or the patrol car during the investigation. Additionally, Jacqueline was having an affair with Carter and she previously had reported Salahuddin's abuse to police. Pettway counter-proffered that cell phone records would demonstrate that, on the day of the murder, Carter's phone was not turned on until around "9:00 or 10:00 at night and then not again until the next morning." Pettway declined to proffer additional evidence because doing so would "tip[] off" the prosecution about his defense.

In a letter opinion, the circuit court denied the motion *in limine* as to Jacqueline and thus allowed Pettway to present evidence and argue as to her guilt.[6] Regarding Carter, the circuit court observed that under *Oliva v. Commonwealth*, 19 Va. App. 523, 527 (1995), "evidence that merely suggests or insinuates that because a third party resembles the accused, the third party *may* have some connection to the crime" is inadmissible. Accordingly, the circuit court

---

[6] Specifically, it found that the "totality of the [proffered] evidence" established that Jacqueline had "gunpowder residue on her person," had experienced "instances of domestic abuse," and was having an affair with Carter, which "clearly" implicated her potential criminal involvement. Accordingly, the circuit court ruled that those circumstances were admissible to demonstrate that Jacqueline committed the offenses, and Pettway could argue that theory to the jury.

prohibited Pettway from presenting evidence and argument "of alleged third-party guilt of [Carter] in order to merely insinuate that he resembles the accused."

On appeal, Pettway contends that the circuit court's ruling prevented him from introducing evidence and argument that Carter committed the offenses, which Pettway asserts violated his right to "call forth evidence in his favor" under the Virginia and United States Constitutions. Specifically, Pettway asserts that the circuit court excluded evidence demonstrating that Carter "possessed a motive to harm" Salahuddin, including evidence that: (1) Carter was having an affair with Jacqueline; (2) Salahuddin was "an alcoholic and abusive husband from whom [Jacqueline] was contemplating a divorce"; and that (3) Jacqueline sent Carter a text message before the murder indicating that "she wanted to be with him rather than her husband."

Under Rule 5A:18, it is the appellant's "burden to obtain a clear ruling from the trial court" on his timely, specific objection. *Young v. Commonwealth*, 70 Va. App. 646, 657 (2019). Otherwise, "there is no ruling for [the appellate court] to review." *Id.* (alteration in original) (quoting *Williams v. Commonwealth*, 57 Va. App. 341, 347 (2010)). Here, the circuit court did not definitively rule on the Commonwealth's motion to exclude evidence or argument regarding Carter's third-party guilt pertaining to the evidence Pettway cites on appeal. At the hearing, the circuit court stated it was not ruling on the issue and would, instead, "issue a written opinion laying out what [it] believe[d] the law is" as a "*framework*" for defense counsel to "gauge[] his argument." (Emphasis added). In the letter opinion, the only clear limitation that the circuit court imposed was that Pettway could not introduce evidence or argument to "merely insinuate" that Carter "resembled" him. Contrary to Pettway's assertion on brief, that ruling did not exclude any specific evidence regarding Carter's motive to murder Salahuddin. In fact, the

- 14 -

circuit court ultimately *admitted* the evidence Pettway claims established Carter's motive to commit the offenses.

To the extent that Pettway interpreted the ruling as precluding him from arguing that Carter had a motive to murder Salahuddin, it was his burden to obtain a clear ruling from the circuit court on that point. *See Young*, 70 Va. App. at 657 (holding that defendant had a duty to obtain clarification on circuit court's ambiguous evidentiary ruling). Pettway did not do so. Because Pettway did not get a clear ruling, there is no ruling for this Court to review.

### D. *Jury Instruction on Concert of Action*

Pettway argues that the circuit court erred by granting Jury Instruction 7, which instructed the jury on concert of action. "This Court 'review[s] jury instructions to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises. This is a mixed question of law and fact.'" *Watson v. Commonwealth*, 298 Va. 197, 207 (2019) (alteration in original) (quoting *Payne v. Commonwealth*, 292 Va. 855, 869 (2016)). "[W]hether a jury instruction accurately states the relevant law is a question of law that we review de novo. However, jury instructions are proper only if supported by the evidence, and more than a scintilla of evidence is required." *Id*. (quoting *Payne*, 292 Va. at 869). "When reviewing a trial court's refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction." *Id*. (quoting *Payne*, 292 Va. at 869). "Nevertheless, a court may exercise its discretion and properly exclude an instruction that both correctly states the law and is supported by the evidence when other granted instructions fully and fairly cover the relevant principle of law." *Id*. (quoting *Payne*, 292 Va. at 869).

Here, Instruction 7 provided:

> If there is concert of action between defendant and Tashara Jackson with the resulting crime one of its incidental probable consequences, then whether such crime was originally contemplated or not, all who participate in any way in bringing it

about are equally answerable and bound by the acts of every other person connected with the consummation of such resulting crime.

The Commonwealth proffered Instruction 7, arguing that it was necessary because the prosecution's theory of the case was that Pettway and Jackson acted in concert. In particular, while the Commonwealth maintained that Pettway was the shooter, it should be able to argue that even if the jury finds Jackson was the shooter, that Pettway acted in concert. Pettway argued in response that this instruction "opens everything up" and should therefore allow the defense to argue that any other individual had committed the crime. Pettway reasoned that because Detective Buchannan could not tell how many people were in the car, it could have been anyone, and Pettway was "completely entitled" to argue that in closing. The circuit court found that there was not sufficient evidence that someone else had been in the car with Pettway, and thus Pettway could not argue for simply any person's guilt based on speculation (but that he could argue for Jacqueline as the perpetrator). It also found that there was sufficient evidence that Pettway and Jackson acted in concert in Salahuddin's murder, and thus granted the instruction.

On appeal, Pettway argues that an instruction on concert of action was improper because the Commonwealth's theory of the case is that Pettway directly performed the shooting himself. He contends that a concert of action instruction would "tend to confuse the jury" and that it was not supported by any of the evidence.

As a preliminary matter, the instruction is a correct statement of the law. *See Rollston v. Commonwealth*, 11 Va. App. 535, 542-44 (1991) (examining the definition of and case law on concerted action and affirming the use of the model jury instruction, identical to what was used here, because the evidence supported the Commonwealth's theory that multiple individuals planned the murders). Furthermore, the Commonwealth's theory of the case—that Pettway and Jackson acted in concert in Salahuddin's murder—is overwhelmingly supported by the evidence. As detailed above, a mountain of evidence, from cell phone location data, video of Jackson's

vehicle, and the text messages exchanged between Pettway and Jackson following the murder, indicates that they acted in concert in commission of these offenses. Accordingly, because the instruction was a correct statement of the law and supported by the evidence, the circuit court did not err in granting the jury instruction.

## III. CONCLUSION

For the above reasons, we affirm the circuit court's judgment.

*Affirmed.*