COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Athey, Causey and Callins
Argued at Winchester, Virginia


RICHETTA VERONIQUE HAMMONDS

MEMORANDUM OPINION* BY
v.        Record No. 0667-23-4        JUDGE CLIFFORD L. ATHEY, JR.
JULY 2, 2024

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
Daniel S. Fiore, II, Judge

Meghan Shapiro, Senior Appellate Attorney (Virginia Indigent
Defense Commission, on briefs), for appellant.

Collin Chayce Crookenden, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Following a jury trial, Richetta Veronique Hammonds ("Hammonds") appeals from her

convictions in the Circuit Court of Arlington County ("trial court") for drinking while driving,

driving while intoxicated, and following too closely, in violation of Code §§ 18.2-323.1, 18.2-266,

and 46.2-816.[1]  Hammonds assigns error to the trial court: (1) for finding the evidence sufficient to

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] The trial court's conviction order in the case numbered CR22-513 notes Hammonds's
conviction for following too closely under Code § 46.2-816.  However, the trial court's
sentencing order correlates this conviction with Code § 18.2-323.1.  It is clear from examining
the record that the mention of Code § 18.2-323.1 in relation to Hammonds's conviction of
following too closely under Code § 46.2-816 was a scrivener's error.  "Code § 8.01-428(B) . . .
allows for the correction of '[c]lerical mistakes in all judgments . . . arising from oversight or
from inadvertent omission.'"  *Jefferson v. Commonwealth*, 298 Va. 473, 476-77 (2020) (second
and third alterations in original) (quoting Code § 8.01-428(B)).  "'[S]crivener's or similar errors
in the record, which are demonstrably contradicted by all other documents, are clerical mistakes'
that 'cause the court's record to fail to "speak the truth."'"  *Id.* at 477 (alteration in original)
(quoting *State Farm Mut. Auto. Ins. Co. v. Remley*, 270 Va. 209, 221 (2005)).  Thus, we remand
the case to the trial court for the limited purpose of correcting the clerical error in the sentencing
order in the case numbered CR22-513.  Code § 8.01-428(B).

support her convictions; (2) for denying her proposed jury instruction; (3) for declining to answer a question posed by the jury during the sentencing phase; and (4) for permitting Virginia State Trooper William Bonnet ("Trooper Bonnet") to testify about his decision not to administer an Intoxilyzer breath test.[2]  Since we find no error, we affirm the convictions.

## I. BACKGROUND

At 2:20 a.m. on February 27, 2022, Trooper Bonnet was patrolling in Arlington County when he observed a white 2014 Ford Focus, later determined to be driven by Hammonds, speeding northbound on I-395.  Dash camera footage from Trooper Bonnet's vehicle reflected that he was following Hammonds's Ford Focus on I-395 and paced her driving at 79 miles per hour in a 55 mile-per-hour speed zone.  At trial, Trooper Bonnet estimated that during his pursuit of Hammonds, she accelerated up to 95 miles per hour.  He further testified that Hammonds "travel[ed] at sporadic rates of speed," failed to maintain her lane, and tailgated the vehicle in front of her car so closely that Trooper Bonnet was unable to see the vehicle she was tailgating.  Based on Trooper Bonnet's training and experience, he opined that Hammonds could not have avoided colliding with the vehicle in front of her if that vehicle had abruptly stopped.  He stated that he was "trained . . . to identify what are proper safe following distances," which would be generally known as "the three second rule" in order "to ensure a safe following distance."

While driving behind Hammonds, Trooper Bonnet then activated his emergency lights to initiate a traffic stop.  As Hammonds pulled to the left shoulder on I-395, Trooper Bonnet activated the vehicle's public announcement system and instructed Hammonds to pull over onto the right shoulder of I-395.  Instead, Hammonds remained parked on the left shoulder of I-395 along the

---

[2] On brief, Hammonds concedes that her fifth assignment of error, challenging the trial court's denial of her motion to strike a juror for cause, is waived because she failed to timely file a transcript indispensable to the determination of that issue.  *See* Rule 5A:8.  Thus, we will not address that assignment of error here.

median. Trooper Bonnet then approached the driver's side of the Ford Focus, requested that Hammonds produce her driver's license, and explained why he had initiated the traffic stop. Hammonds disregarded Trooper Bonnet's request for identification. Next, he ordered her to turn the car off and when she did not, he walked to the passenger side of Hammonds's car, opened the door, and removed the keys from the car's ignition.

As Trooper Bonnet interacted with Hammonds, he noticed an odor of alcohol coming from Hammonds's person and that her eyes were glassy and that she appeared confused. Based on his training and experience, Trooper Bonnet surmised that Hammonds may have been under the influence of alcohol. He requested that Hammonds exit her vehicle, which she did. Trooper Bonnet again explained why he had initiated the traffic stop. He further inquired about where she was coming from and what her destination was. He then asked her to voluntarily participate in field sobriety tests. Hammonds agreed to perform the field sobriety tests, but she refused to tell Trooper Bonnet where she had been driving.

Trooper Bonnet administered three field sobriety tests: the horizontal gaze nystagmus ("HGN") test, the nine-step walk-and-turn test,[3] and the one-leg stand test.[4] Before conducting the tests, Trooper Bonnet asked Hammonds what her highest level of education was. Hammonds answered that she had a bachelor's degree. He also asked Hammonds if she had any prior injuries. Hammonds relayed that she had once suffered a gunshot injury, but she did not elaborate further about the injury.

---

[3] The nine-step walk-and-turn test required Hammonds to take nine steps along the yellow line touching her heel to her toe. Upon taking her ninth step, Hammonds was instructed to take a series of small steps to turn back the way she had traveled. Hammonds would then walk nine steps, heel to toe, back to her starting position.

[4] The one-leg stand required Hammonds to stand with her feet together and her arms down at her side. Hammonds would take either her right or left foot and raise it 6 inches off the ground for 30 seconds.

During the HGN test, Hammonds manifested nystagmus—involuntary jerking of the eyes. Trooper Bonnet noted that nystagmus indicated that Hammonds may be impaired. Then, while completing the nine-step walk-and-turn test, Hammonds moved from her starting position, used her arms for balance, took only four steps forward, never touched her heel to her toe, improperly turned around, and then only took seven steps back to her starting position. Finally, during the one-leg stand test, Hammonds could not maintain her balance and switched the foot she was standing on. Trooper Bonnet concluded from these field sobriety test results that Hammonds was impaired.

Trooper Bonnet then arrested Hammonds and secured her inside a law enforcement vehicle. A second state trooper watched Hammonds, while Trooper Bonnet and a third state trooper searched Hammond's Ford Focus. Trooper Bonnet testified that the vehicle smelled like alcohol and that during the search they recovered two bottles of Hennessey liquor on the back seat. One of the bottles was unsealed, half-full, and within reach of the driver's seat. The other bottle was unopened.

At trial, the Commonwealth introduced video showing Hammonds being transported to the local jail. While en route, she made several statements that were captured on Trooper Bonnet's dash camera.[5] For example, she stated, "I fucked up. I fucked up. Yes, I drunk some Hennessey tonight. I fucked up." She continued, "I'm drunk. I'm drunk." She noted that she had "been doing this shit for like a long time . . . I get high, I get drunk. And I go up and down I-95 all the [] time" and "[t]hat's the first time I ever been locked up."

On cross-examination, Hammonds's counsel then asked Trooper Bonnet if he knew "how to get a warrant for a blood draw?" When Trooper Bonnet indicated that he did, Hammonds's counsel then asked, "How does that work?" Trooper Bonnet then explained the process and admitted that

---

[5] The dash camera simultaneously captured the vehicle's interior and the road in front of the patrol car.

- 4 -

he had not sought a warrant for drawing blood in this case. On re-direct examination, the Commonwealth then asked Trooper Bonnet, "[W]hy didn't you get a warrant for her blood?" Trooper Bonnet stated that Hammonds was uncooperative once they arrived at the jail. He noted that upon arrival, he brought her to the Intoxilyzer. Then Hammonds's counsel objected to Trooper Bonnet's answer as prejudicial. During the subsequent sidebar, Hammonds's counsel argued that the evidence was prejudicial and "makes it seem as if . . . she's guilty of [unreasonably refusing the breath test]" when she had already been acquitted of that charge. The trial court, however, found that Hammonds had opened the door when her counsel questioned Trooper Bonnet about the process for obtaining a blood test and therefore overruled Hammonds's objection. Continuing his answer, Trooper Bonnet explained that he "chose not to go with a blood draw or attempt to have Ms. Hammonds do the Intoxilyzer machine" because she had been uncooperative, and he did not think it was prudent to do so.

Hammonds moved to strike the driving under the influence charge, the drinking while driving charge, and following too closely charge, alleging that the evidence was insufficient as a matter of law. The trial court denied the motion. Hammonds then testified on her own behalf, admitting that she had purchased two bottles of Hennessey on February 26, 2022, and that she consumed two alcoholic drinks between 5:00 p.m. and 6:00 p.m. She denied consuming any other alcoholic beverages that evening. She further testified that when she left home around midnight, to drive her husband to work, she brought both bottles of Hennessey with her because she expected to visit her sister at her home in Washington, D.C. She added that she intended to share a drink of Hennessey with her sister before returning home, further explaining that it was normal for her to visit her sister late at night.

Hammonds testified that she was traveling to her sister's house when she was stopped by Trooper Bonnet. She asserted that she pulled over when he directed her to and immediately put on

a mask because she was concerned about COVID-19. Hammonds also admitted that she did not immediately identify herself when asked because she "just felt like I didn't need to" as Trooper Bonnet had not "give[n] [her] a reason why he was stopping [her] or anything." Hammonds further asserted that she became terrified when Trooper Bonnet began to yell at her and that her terror grew when Trooper Bonnet opened her passenger door and removed the keys from the car's ignition. She further explained that after Trooper Bonnet returned to the driver's side of her car, she put hand sanitizer on because Trooper Bonnet had just been in her vehicle and she was nervous about contracting COVID-19. She claimed that the hand sanitizer was why she smelled of alcohol.

Hammonds next claimed that she agreed to perform the field sobriety tests to appease Trooper Bonnet and that she explained that she had been shot in the ankle and consequently her balance was poor. She denied that her statements made while traveling to jail were a confession that she had been drinking and driving. Hammonds claimed that she was merely explaining to Trooper Bonnet that she does drink alcohol and get high but not together and not while driving.

While the jury deliberated on Hammonds's guilt or innocence, the trial court heard argument on the sentencing instructions. Hammonds proffered Sentencing Instruction P:

> You have found Mrs. Hammonds guilty of the crime of driving while under the influence of alcohol.
>
> Upon consideration of all the evidence you have heard, you shall fix the [sic] Mrs. Hammonds' punishment at:
>
> (1) A revocation of Mrs. Hammonds' driver's license for one year, the completion of the Virginia Alcohol Safety Action Program, and, a fine of a specific amount, but not less than $250 nor more than $2,500; or,
>
> (2) A revocation of Mrs. Hammonds' driver's license for one year, the completion of the Virginia Alcohol Safety Action Program, a fine of a specific amount, but not less than $250 nor more than $2,500, and confinement in jail for a specific time, but not more than twelve (12) months.

Hammonds acknowledged to the trial court that Instruction P was not a model jury instruction, but she argued that the instruction was nevertheless an accurate statement of the law and applicable to the case. She noted that the jury was instructed that it had to impose at least a $250 fine. Informing the jury about that mandatory fine, she argued, was no different than informing the jury about the mandatory requirements that her license be revoked for 12 months and that she complete the Virginia Alcohol Safety Action Program ("VASAP"). She contended that the jury should know what the "actual punishment" would be for her first driving under the influence of alcohol conviction.

In rejecting Instruction P, the trial court found that it was confusing in that the instruction would inform the jury on the consequences of a DUI conviction that are "not the jury's prerogative." The trial court then denied Hammonds's request to reference the mandatory penalties in her argument to the jury before sentencing.

After the jury returned its verdict of guilty on all three offenses, the sentencing phase of the trial commenced. After sentencing evidence was presented, the trial court instructed the jury; counsel offered sentencing arguments; and the jury retired to deliberate. During sentencing deliberations, the jury asked the trial court, "[W]ith the guilty verdict for the three charges, does she automatically lose her license? And if so, for what period of time?"

The Commonwealth argued that the trial court should not answer the jury's question because whether Hammonds license was suspended was irrelevant to their sentencing determination. Further, the suspension of a license is subject to several conditions. Hammonds argued the jury should be made aware that her conviction carried with it a mandatory suspension of her license of 12 months and a required class. The trial court noted that "there are certain what-ifs involved in this, in an answer" and that "[i]t's not a simple yes answer." The trial court declined to

inform the jury about the mandatory penalties and instructed the jury to determine the sentence as previously instructed.

Following sentencing deliberations, the jury recommended the imposition of one week in jail and a $500 fine for driving while under the influence of alcohol, a $200 fine for drinking while driving, and a $100 fine for following too closely. The trial court subsequently sentenced Hammonds to 7 days in jail, imposed the recommended $800 in fines, suspended Hammonds's driver's license for 12 months, and ordered that she complete VASAP. The court then suspended all 7 days of incarceration and all but $250 of the fines. Hammonds appealed.

## II. ANALYSIS

### A. *Standard of Review*

"What the elements of the offense are is a question of law that we review de novo." *Linnon v. Commonwealth*, 287 Va. 92, 98 (2014) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 223 (2013)). "Whether the evidence adduced is sufficient to prove each of those elements is a factual finding, which will not be set aside on appeal unless it is plainly wrong." *Lawlor*, 285 Va. at 223-24. "In reviewing that factual finding, we consider the evidence in the light most favorable to the Commonwealth and give it the benefit of all reasonable inferences fairly deducible therefrom." *Id.* at 224. "After so viewing the evidence, the question is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Commonwealth v. McNeal*, 282 Va. 16, 20 (2011)). "In sum, if there is evidence to support the conviction, the reviewing court is not permitted to substitute its judgment, even if its view of the evidence might differ from the conclusions reached by the finder of fact at the trial." *Id.* (quoting *McNeal*, 282 Va. at 20).

"The sole responsibility to determine the credibility of witnesses, the weight to be given to their testimony, and the inferences to be drawn from proven facts lies with the fact finder."

*Blankenship v. Commonwealth*, 71 Va. App. 608, 619 (2020) (quoting *Ragland v. Commonwealth*, 67 Va. App. 519, 529-30 (2017)). Moreover, "[t]he conclusions of the fact finder on issues of witness credibility may be disturbed on appeal only when we find that the witness' testimony was 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Ashby v. Commonwealth*, 33 Va. App. 540, 548 (2000) (quoting *Fisher v. Commonwealth*, 228 Va. 296, 299 (1984)). "In all other cases, we must defer to the conclusions of 'the fact finder[,] who has the opportunity of seeing and hearing the witnesses.'" *Id.* (alteration in original) (quoting *Schneider v. Commonwealth*, 230 Va. 379, 382 (1985)).

"This deferential principle applies not only to 'matters of witness credibility' but also to the factfinder's 'interpretation of all of the evidence, including video evidence' presented at trial." *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (quoting *Meade v. Commonwealth*, 74 Va. App. 796, 806 (2022)). "The factfinder 'views video and other evidence to determine what it believes happened; we, on appellate review, view video evidence not to determine what we think happened, but for the limited purpose of determining whether any rational factfinder could have viewed it as the [factfinder] did.'" *Id.* (alteration in original).

"A reviewing court's responsibility in reviewing jury instructions is to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises." *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019) (quoting *Darnell v. Commonwealth*, 6 Va. App. 485, 488 (1988)). "Whether to give or deny jury instructions 'rest[s] in the sound discretion of the trial court.'" *Hilton v. Commonwealth*, 293 Va. 293, 302 (2017) (alteration in original) (quoting *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009)). "[W]hether a jury instruction accurately states the relevant law is a question of law that we review de novo." *Watson v. Commonwealth*, 298 Va. 197, 207 (2019) (quoting *Payne v. Commonwealth*, 292 Va. 855, 869 (2016)).

"The 'admissibility of evidence is within the discretion of the trial court, and an appellate court will not reject such decision absent an abuse of discretion.'" *McBride v. Commonwealth*, 75 Va. App. 556, 569 (2022) (internal quotation marks omitted) (quoting *Williams v. Commonwealth*, 71 Va. App. 462, 487 (2020)). "The abuse of discretion standard draws a line— or rather, demarcates a region—between the unsupportable and the merely mistaken, between the legal error . . . that a reviewing court may always correct, and the simple disagreement that, on this standard, it may not." *Jefferson v. Commonwealth*, 298 Va. 1, 10-11, (2019) (alteration in original) (quoting *Reyes v. Commonwealth*, 297 Va. 133, 139 (2019)). "[T]he abuse of discretion standard requires a reviewing court to show enough deference to a primary decisionmaker's judgment that the [reviewing] court does not reverse merely because it would have come to a different result in the first instance." *Commonwealth v. Thomas*, 73 Va. App. 121, 127 (2021) (alterations in original) (quoting *Lawlor*, 285 Va. at 212).

B. *The circuit court did not err in finding the evidence sufficient.*

Hammonds argues that the trial court erred in denying her motion to strike. In challenging the trial court's denial of her motion to strike, Hammonds necessarily asserts that the jury should not have been allowed even to consider the charges because "[a] motion to strike challenges whether the evidence is sufficient to submit the case to the jury." *Linnon*, 287 Va. at 98 (quoting *Lawlor*, 285 Va. at 223). As a result, her challenge raises the questions of whether the evidence adduced sufficiently presented "a *prima facie* case [of driving under the influence of alcohol, drinking while driving, and following too closely] for consideration by the" jury. *Vay v. Commonwealth*, 67 Va. App. 236, 254 (2017) (quoting *Hawkins v. Commonwealth*, 64 Va. App. 650, 657 (2015)).

1. <u>Charge of drinking while operating a motor vehicle</u>

Hammonds argues that the Commonwealth failed to prove that the unsealed bottle of alcohol was within her reach while she drove and that she was consuming alcohol while driving. She asserts that there was no evidence, such as video footage or photographs of the bottle, to support the trooper's conclusion that it was within her reach while she drove. Hammonds also argues that there is no direct evidence that she consumed alcohol *while* driving. We disagree.

"It is unlawful for any person to consume an alcoholic beverage while driving a motor vehicle upon a public highway of the Commonwealth." Code § 18.2-323.1(A). In assessing the evidence for the consumption of alcohol while driving, the jury was entitled to resolve any conflicts in the evidence, including determining that Hammonds was lying to conceal her guilt and rejecting her testimony. *See Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011).[6]

Here, dash camera footage from the incident showed what transpired during the traffic stop and Hammonds's performance during multiple field sobriety tests. Trooper Bonnet testified that when he stood at Hammonds's driver-side window, he observed her eyes were glassy, she appeared disoriented, and she smelled like alcohol. Hammonds failed to properly perform several field sobriety tests; she displayed multiple signs of intoxication including nystagmus, poor balance, and an inability to follow Trooper Bonnet's instructions.

---

[6] Code § 18.2-323.1(B) establishes a rebuttable presumption that the driver has consumed alcohol when:

> (i) an open container is located within the passenger area of the motor vehicle, (ii) the alcoholic beverage in the open container has been at least partially removed, and (iii) the appearance, conduct, odor of alcohol, speech, or other physical characteristic of the driver of the motor vehicle may be reasonably associated with the consumption of an alcoholic beverage.

"[O]ur general rule is to give rebuttable presumptions permissive or burden-of-production-shifting effect only." *See Wilson v. Commonwealth*, 225 Va. 33, 41 (1983).

After arresting Hammonds and placing her in a patrol vehicle, Trooper Bonnet and another trooper searched Hammonds's vehicle. The troopers found two bottles of liquor in the vehicle's back seat. One of the bottles was open and half-full. Trooper Bonnet testified that the open bottle was within reach of the driver's seat. In addition, while en route to the jail, Hammonds admitted that she had made a mistake and that she was "drunk."

Upon these facts and circumstances, a jury reasonably could conclude that the Commonwealth's evidence established the elements of the presumed crime and reject Hammonds's claim that she had not been drinking while driving. Thus, the trial court did not err in denying Hammonds's motion to strike as to the charge of drinking while driving.

### 2. Charge of driving a motor vehicle while intoxicated

Hammonds further contends that the evidence did not prove that she was intoxicated when Trooper Bonnet stopped her and that there were innocent explanations for her behavior during the incident. She contends that she was unable to perform the nine-step walk test and the one-leg test because of Trooper Bonnet's "confusing demonstration" and her past injury's impact upon her ability to balance. She also argues that all the statements she made that evening were because she was under stress and scared. She contends that her statements were not a confession but rather were designed to allow her to return home to her children. Finally, Hammonds notes that there was no scientific evidence that she was intoxicated. We disagree.

When the "defendant's theory of the case differs from that taken by the Commonwealth [that] does not mean that every reasonable hypothesis consistent with his innocence has not been excluded. What weight should be given evidence is a matter for the [factfinder] to decide." *Edwards v. Commonwealth*, 68 Va. App. 284, 301 (2017) (second alteration in original) (quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 9 (2004)). "By finding [a] defendant guilty, therefore, the factfinder 'has found by a process of elimination that the evidence does not contain

a reasonable theory of innocence.'" *Id.* (alteration in original) (quoting *Haskins*, 44 Va. App. at 9). "While a factfinder may not arbitrarily disregard a reasonable doubt, whether 'the hypothesis of innocence is reasonable is itself a "question of fact," subject to deferential appellate review.'" *Burton v. Commonwealth*, 58 Va. App. 274, 285-86 (2011) (quoting *Clanton v. Commonwealth*, 53 Va. App. 561, 572 (2009) (en banc)). "In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal [her] guilt." *See Flanagan*, 58 Va. App. at 702 (quoting *Marable v. Commonwealth*, 27 Va. App. 505, 509-10 (1998)).

"It shall be unlawful for any person to drive or operate any motor vehicle . . . while such person is under the influence of alcohol." Code § 18.2-266(ii). In determining whether a defendant was under the influence, a fact finder considers "all of the evidence of [her] condition at the time of the alleged offense." *Hogle v. Commonwealth*, 75 Va. App. 743, 754 (2022) (quoting *Leake v. Commonwealth*, 27 Va. App. 101, 109 (1998)). This Court has found that "[a] defendant's admission that [she] consumed several alcoholic beverages, together with the testimony of the arresting officer regarding the defendant's appearance and lack of coordination, is sufficient to support a conviction for driving under the influence of alcohol." *Id.* (first alteration in original) (quoting *Lemond v. Commonwealth*, 19 Va. App. 687, 694 (1995)).

Further, "[t]est results from a breath or blood test are not necessary or required to prove driving under the influence of alcohol." *Oliver v. Commonwealth*, 40 Va. App. 20, 24 (2003). "[T]he admission of the blood or breath test results shall not limit the introduction of any other relevant evidence . . . and [the fact finder] shall, regardless of the result of any blood or breath tests, consider other relevant admissible evidence of the condition of the accused." Code § 18.2-268.10.

- 13 -

Based on the totality of the evidence in this record, a reasonable fact finder could have concluded beyond a reasonable doubt that Hammonds was operating her vehicle while under the influence of alcohol. Hammonds admitted that she consumed two drinks of alcohol between 5:00 p.m. and 6:00 p.m. on February 26, 2022. Trooper Bonnet testified that when he first interacted with Hammonds her eyes were glassy and she smelled of alcohol. While performing field sobriety tests, Hammonds presented with nystagmus and she was unable to perform neither the walk-and-turn test nor the one-leg test correctly. In addition, Hammonds made multiple statements after her arrest that she was drunk, that she had failed Trooper Bonnet's tests, and that she had "fucked up." Further, the entire encounter was captured on Trooper Bonnet's dash camera and was shown to the jury. From these facts and circumstances, a reasonable fact finder could conclude beyond a reasonable doubt that Hammonds was driving under the influence of alcohol. Thus, the trial court did not err in denying Hammonds's motion to strike.

### 3. Charge of following too closely

Finally, Hammonds argues that the evidence showed that she was following the vehicle in front of her at a reasonable distance given the circumstances. Hammonds contends that it was only when Trooper Bonnet moved directly behind her that the distance became unclear on the video. Although Trooper Bonnet testified that Hammonds was not following the "three second rule," Hammonds argues that Code § 46.2-816 "does not criminalize driving one or two car lengths behind another car." We disagree.

"The driver of a motor vehicle shall not follow another vehicle . . . more closely than is reasonable and prudent, having due regard to the speed of both vehicles and the traffic on, and conditions of, the highway at the time." Code § 46.2-816. The Supreme Court of Virginia has "construed this statute as granting a driver the right to follow another vehicle as closely as is

- 14 -

reasonable and prudent under the circumstances." *Clifton v. Gregory*, 212 Va. 859, 862 (1972).[7] "What constitutes a reasonable distance must, in each instance, depend upon the particular facts involved." *Id.*

Considered in the light most favorable to the Commonwealth, the evidence was sufficient for a reasonable fact finder to conclude that Hammonds was following the vehicle in front of her at an unreasonable distance. Trooper Bonnet testified that when he positioned his patrol car directly behind Hammonds, he could not see the vehicle in front of her. Footage from Trooper Bonnet's dash camera depicted Hammonds's vehicle as it drove in front of Trooper Bonnet. Although Hammonds avoided a collision with the front vehicle when it slowed, a reasonable fact finder could conclude beyond a reasonable doubt that she nonetheless was following at an unreasonable and imprudent distance under the circumstances. Consequently, the trial court did not err in denying Hammonds's motion to strike this charge.

C. *The circuit court did not err in denying Hammonds's proffered jury instruction.*

Hammonds argues that the trial court erred when it failed to give her proffered instruction on the mandatory punishments associated with driving under the influence of alcohol, including mandatory suspension of her driver's license and the VASAP requirement. She argues that her Sentencing Instruction P was an accurate statement of law and thus should have been given to the jury. Because the jury was not instructed about the mandatory penalties, she claims, it "operated upon the invalid premise that [her] sentence would not include suspension of her driver's license" and that incarceration was needed. We disagree.

"[J]ury instructions are proper only if supported by the evidence, and more than a scintilla of evidence is required." *Watson*, 298 Va. at 207 (quoting *Payne*, 292 Va. at 869). As

_____

[7] The *Clifton* case specifically discusses Code § 46.1-213 (1983), where Code § 46.2-816 was formerly codified.

- 15 -

the challenged instruction was offered by Hammonds, the burden was on her to show that the proposed instruction was a "correct statement of the law, applicable to the facts of the case on trial, and expressed in appropriate language." *Miller v. Commonwealth*, 64 Va. App. 527, 547 (2015) (quoting *Shaikh v. Johnson*, 276 Va. 537, 546 (2008)).

"Virginia has a long and honored system of jury sentencing. Juries have been empowered to sentence their peers in the Commonwealth from as early as 1776." *Walker v. Commonwealth*, 25 Va. App. 50, 60 (1997). "Under our system, the assessment of punishment is a function of the judicial branch of government, while the administration of such punishment is a responsibility of the executive department." *Hinton v. Commonwealth*, 219 Va. 492, 496 (1978). The rule in Virginia aims "to preserve, as effectively as possible, the separation of those functions." *Id.*

Under Code § 18.2-270(A), a person convicted of first offense DUI under Code § 18.2-266 "shall be guilty of a Class 1 misdemeanor with a mandatory minimum fine of $250." A Class 1 misdemeanor is punishable by "confinement in jail for not more than twelve months and a fine of not more than $2,500, either or both." Code § 18.2-11(a). In addition, "the judgment of conviction" for a first offense of DUI "shall of itself operate to deprive the person so convicted of the privilege to drive or operate any motor vehicle . . . in the Commonwealth for a period of one year from the date of such judgment." Code § 18.2-271(A).

"As a general rule, in determining a defendant's sentence, a jury is not permitted to consider what may happen to a defendant after the jury reaches its verdict." *Booker v. Commonwealth*, 276 Va. 37, 41 (2008); *see also Yarbrough v. Commonwealth*, 258 Va. 347, 370 (1999); *Jones v. Commonwealth*, 194 Va. 273, 275 (1952). The Supreme Court of Virginia recognized an exception to this general rule in *Fishback v. Commonwealth*, 260 Va. 104 (2000).

In *Fishback*, the Supreme Court addressed whether a defendant convicted of a non-capital offense felony was entitled to a jury instruction stating that parole had been abolished in Virginia.

*Id.* at 108. Before addressing the merits, the Supreme Court recognized the long-standing principle that "'truth in sentencing' is a goal to be desired in the judicial process." *Id.* at 113. To that end, the Supreme Court reasoned that "[a] jury should not be required to perform [the] critical and difficult responsibility" of fixing a defendant's specific term of confinement "without the benefit of all significant and appropriate information that would avoid the necessity that it speculate or act upon misconceptions concerning the effect of its decision." *Id.* Thus, the Court concluded, the jury should be informed about the statutory enactments abolishing parole. *Id.* at 115-16. The Court further noted that, where appropriate, a jury should be informed about the possibility of geriatric release. *Id.* The Court observed, however, that juries should not be informed about things that invite speculation concerning the likelihood of future actions, such as a defendant's eligibility for earned sentencing credits once incarcerated or executive clemency. *Id.* at 116.

In *Booker*, the Supreme Court considered whether it was proper for the trial court to inform the jury that the court could reduce, but not increase, the sentence set by the jury. 276 Va. at 42. The Court reasoned that the trial court's instruction to this effect had "permitted the jury to consider as part of its sentencing determination the speculative factor whether the circuit court later would reduce [the defendant's] sentence given the nature of his crimes, the other evidence in the case, or factors unknown to the jury at the time it imposed its sentence." *Id.* at 42-43. Such speculation, the Court determined, "could have resulted in the jury incorrectly concluding that its role in the sentencing process was minimal and, thus, have yielded a result 'inconsistent with a fair trial both to the defendant and the Commonwealth.'" *Id.* at 43 (quoting *Fishback*, 260 Va. at 115). Thus, the Supreme Court concluded that the trial court improperly instructed the jury. *Id.*

As Code § 18.2-271(A) makes clear, the judgment for a first-offense DUI conviction *itself* operates to suspend the defendant's driver's license for a year. It is not part of the determination of

- 17 -

sentence that the fact finder must make after returning a guilty verdict of DUI. *See* Code § 18.2-270(A).

The instruction proffered by Hammonds more closely resembles the instruction in *Booker* than the parole abolition instruction in *Fishback*. Informing the jury about the mandatory driver's license suspension for DUI merely invites speculation about the consequences of a conviction other than incarceration or a fine, which the jury was charged with determining in accordance with Code § 18.2-11(a). Although Hammonds was subject to a suspension of her license for 12 months by operation of statute, imposing the conditions of that suspension was in the discretion of the trial court.[8] And according to *Booker*, a trial court should not instruct the jury that the court could reduce the sentence recommended by the jury. Thus, we find that the trial court did not err when it refused Instruction P.

D. *Hammonds's has waived her assignment of error concerning the trial court's response to the jury's question.*

Hammonds contends that the trial court's response to the jury's question was inadequate. But she does not cite to any legal authority to support her claim about the trial court's response. Instead, she only addresses the trial court's refusal of proposed Sentencing Instruction P. For the following reasons, we find this assignment of error waived.

"Rule 5A:20(e) requires that an appellant's opening brief contain '[t]he principles of law, the argument, and the authorities relating to each question presented.'" *Fadness v. Fadness*, 52

---

[8] The dissent reasons that because "[i]t is certain, not speculative, that Hammonds would have her license suspended and be enrolled in ASAP" that Hammonds's requested instruction furthered the goal of "truth in sentencing." However, this conclusion ignores the fact that this determination was not part of the sentencing decision but was a function of the conviction itself under Code § 18.2-266. *See* Code § 18.2-271 ("the judgement of conviction for a first offense under § 18.2-266 . . . shall of itself operate to deprive the person so convicted of the privilege to drive"); *see also* Code § 18.2-271.1 (a conviction under Code § 18.2-266 requires "as a condition of probation or otherwise, to enter into and successfully complete an alcohol safety action program"). Thus, allowing the jury to speculate on this matter would be in error.

- 18 -

Va. App. 833, 850 (2008) (alteration in original) (quoting *Jones v. Commonwealth*, 51 Va. App. 730, 734 (2008)). "Unsupported assertions of error 'do not merit appellate consideration.'" *Id.* (quoting *Jones*, 51 Va. App. at 734). "A court of review is entitled to have the issues clearly defined and to be cited pertinent authority. The appellate court is not a depository in which the appellant may dump the burden of argument and research." *Id.* (quoting *Jones*, 51 Va. App. at 734). "[W]hen a party's 'failure to strictly adhere to the requirements of Rule 5A:20(e)' is significant, 'the Court of Appeals may . . . treat a[n assignment of error] as waived.'" *Atkins v. Commonwealth*, 57 Va. App. 2, 20 (2010) (second alteration in original) (quoting *Parks v. Parks*, 52 Va. App. 663, 664 (2008)).

When a party "believe[s] that the circuit court erred," it is the duty of that party "to present that error to us with legal authority to support their contention." *Fadness*, 52 Va. App. at 851. With respect to Hammonds's third assignment of error, she did not do so. Because we find that Hammonds's failure to comply strictly with the requirements of Rule 5A:20 is significant, we find that she has waived this argument. *See Parks*, 52 Va. App. at 664 ("[W]hen a party's 'failure to strictly adhere to the requirements of Rule 5A:20(e)' is significant, 'the Court of Appeals may . . . treat a question presented as waived.'" (second alteration in original) (quoting *Jay v. Commonwealth*, 275 Va. 510, 520 (2008))).

### E. *The trial court did not err by allowing witness testimony concerning the use of an Intoxilyzer.*

Hammonds argues that the trial court erred when it permitted Trooper Bonnet to testify on re-direct examination that he chose not to administer the Intoxilyzer machine because Hammonds was uncooperative. Hammonds contends that Code § 18.2-268.10(B) prohibits evidence of her failure "to permit a . . . breath sample to be taken to determine the alcohol or drug content of [her] blood," or an "offer" of such testing. She notes that she was acquitted of unreasonably refusing a breath test. Thus, she argues, the Commonwealth was prohibited from commenting on or eliciting

testimony about her refusal to provide a breath sample or to accept an offer to take a breath test. She further argues that Trooper Bonnet's testimony was inappropriate rebuttal testimony as it did not address a material issue raised by her evidence. She asserts that her cross-examination of Trooper Bonnet focused on a *blood* test rather than a *breath* test. Thus, she contends, her failure to permit a *breath* test was not a material issue related to the absence of a *blood* test in this case. We disagree.

Code § 18.2-268.10(B) prohibits the Commonwealth from commenting on or presenting evidence of "[t]he failure of an accused to permit a blood or breath sample to be taken to determine the alcohol or drug content of [her] blood" or an offer of "a blood or breath test . . . except in rebuttal or pursuant to subsection C."[9] "[W]here a defendant raises the issue" the "evidence of a refusal to take a test becomes material for rebuttal." *Calhoun v. Commonwealth*, 35 Va. App. 506, 509 (2001). Code § 18.2-268.1 is the definitional section of the statute. In that section, it is clear that "[t]he phrase '*blood or breath*' means either or both." Code § 18.2-268.1.

Here, Trooper Bonnet's testimony did not address an offer of, or Hammonds's refusal to, permit a blood or breath test. Instead, Trooper Bonnet's testimony concerned why he did not administer a breath or blood test *at all*. He explained that he "chose not to go with a blood draw or attempt to have Ms. Hammonds do the Intoxilyzer machine" because she was being uncooperative. Thus, his testimony was proper rebuttal evidence as it addressed a material issue raised by Hammonds's cross-examination concerning whether he knew "how to get a warrant for a blood draw." Consequently, Code § 18.2-268.10(B) did not prohibit Trooper Bonnet's testimony in this case. Thereby, the trial court did not abuse its discretion in allowing Trooper Bonnet to testify about his decision not to conduct a breath test with Hammonds.

---

[9] Subsection C of Code § 18.2-268.10 permits evidence of the defendant's "unreasonable refusal to permit a blood or breath sample to be taken" to be admitted "for the sole purpose of explaining the absence at trial of a chemical test." This subsection does not apply here.

### III. Conclusion

For the foregoing reasons, we affirm the trial court's judgment, but remand to the trial court for the limited purpose of correcting a clerical error in the sentencing order in the case numbered CR22-513.

*Affirmed and remanded.*

Causey, J., concurring in part, and dissenting in part.

I dissent from the majority's affirmance of the circuit court's denial of Hammonds's motion to give a jury instruction about the mandatory penalties it would impose on Hammonds and denial of Hammonds request to argue about the same. I concur in the remainder of the opinion. Hammonds's requested instruction that she would have her license suspended and be enrolled in ASAP was "materially vital" to Hammonds's case in the sentencing phase of trial. Such information would have properly furthered the goal of "truth in sentencing," and it was error to not give Hammonds's proposed instruction. Thus, I would vacate Hammonds's sentence and remand the case for resentencing.

"A proposed jury instruction submitted by a party, which constitutes an accurate statement of the law applicable to the case, *shall not be withheld from the jury solely for its nonconformance with model jury instructions*." Code § 19.2-263.2 (emphasis added). Neither party disputes that Hammonds would have had her license suspended and been enrolled in the ASAP program as part of her sentence. Thus, Hammonds's requested jury instruction is an accurate statement of the law, just not in conformance with model jury instructions.

"As a general rule, in determining a defendant's sentence, a jury is not permitted to consider what may happen to a defendant after the jury reaches its verdict." *Booker v. Commonwealth*, 276 Va. 37, 41 (2008). "We recognized an exception to this general rule, however, in our holding in *Fishback v. Commonwealth*, 260 Va. 104 (2000)." *Id.* In *Fishback*, the Court held that the defendant "was entitled to have the jury instructed that parole has been abolished in Virginia for offenses committed after January 1, 1995," and that "when applicable, a jury also shall be instructed that a defendant could be eligible for a geriatric release as permitted by statute." *Id.* at 41-42. The Court in *Booker* reasoned that "[a] jury instruction regarding a defendant's ineligibility for parole is proper, because it serves to eliminate a common

- 22 -

misconception that a defendant may only serve a small portion of a jury's sentence." *Id.* at 42. The Court drew a distinction between cases when juries are *not* permitted to consider what happens to a defendant after the jury reaches its verdict and cases when juries *should* be permitted to consider this issue. It stated that there is

> an important distinction between instructions that properly further *the goal of 'truth in sentencing'* by removing the possibility that a jury will act upon misconceptions, and those instructions that have the improper effect of *inviting the jury to speculate* concerning the likelihood of future actions that may ultimately affect the length of a defendant's incarceration.

*Id.* (emphases added); *see id.* at 42-43 (concluding that the requested jury "instruction should not have been given because it effectively permitted the jury to consider as part of its sentencing determination *the speculative factor whether the circuit court later would reduce Booker's sentence* given the nature of his crimes" (emphasis added)).

Here, the instruction that Hammonds requested is one that furthers the goal of truth in sentencing because it would not invite the "jury to speculate" about "the likelihood of future actions." It is certain, not speculative, that Hammonds would have her license suspended and be enrolled in ASAP. This information, like the information that a defendant has no option for parole, is information that "serves to eliminate a common misconception that" a sentence consisting of a fine without a period of confinement would be insufficient to deter and/or rehabilitate Hammonds. Such information was "materially vital to [Hammonds]'s case in the penalty-determination phase of [her] trial." *Fishback*, 260 Va. at 117 (vacating Fishback's sentences and remanding for resentencing because "[t]he jury's knowledge of the abolition of parole[, including the availability of geriatric release,] was materially vital to Fishback's case in the penalty-determination phase of his trial"); *see Booker*, 276 Va. at 43 ("[W]e hold that the circuit court's action giving the improper instruction requires reversal of this case, and that the

- 23 -

Court of Appeals erred in reaching a contrary conclusion.").[10] Thus, Hammonds's sentence

should be reversed and remanded for a new sentencing hearing.

---

[10] To the extent that Hammonds's requested instruction was not a completely accurate statement of the law, the circuit court "was required to correct the instructions and give them in their accurate form." *See Commonwealth v. Jerman*, 263 Va. 88, 92-93 (2002).